**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 37523**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2012 Opinion No. 78A |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: January 3, 2012 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| TRACI N. HADDEN, | ) | AMENDED OPINION |
| | ) | THE COURT'S PRIOR OPINION |
| Defendant-Appellant. | ) | DATED DECEMBER 27, 2011 IS |
| | ) | HEREBY AMENDED. |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Lincoln County. Hon. John K. Butler, District Judge.

Judgment of conviction for grand theft, affirmed.

Molly J. Huskey, State Appellate Public Defender; Sarah E. Tompkins, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Judge

Traci N. Hadden appeals from her judgment of conviction for grand theft. Hadden contends the district court erred in instructing the jury and in denying her motions for change of venue. For the reasons set forth below, we affirm.

**I.**

**FACTS AND PROCEDURE**

In January 2009, Hadden was charged with grand theft of approximately twenty calves owned by Steven Bilbao, a cattle rancher near Shoshone, Lincoln County, Idaho. The charge arose from an incident in the winter of 2008, where Bilbao awoke to find that twenty head of cattle were missing from his ranch. Hadden filed a motion for change of venue, primarily due to the extensive pretrial publicity surrounding unrelated charges for the attempted murder of her former father-in-law, Craig Hadden, a well-known realtor and businessman in the area, and for the solicitation of the murder of a police officer, filed against her during the pendency of this

1

case. The district court denied the motion. Hadden again renewed her request for a change of venue during jury selection, which the district court again denied.

At trial, Blaine Ramey, a rancher and owner of a cattle company in Bingham County, Idaho, testified he purchased Bilbao's cows after being contacted by a man named Laramie Keppner, with whom he often did business, about buying some cows from a woman who was going through a divorce. Ramey testified Keppner was accompanied during the transaction by a woman and two teenage boys. During the transaction, a brand inspector came to the ranch and indicated the brand on the cattle was Bilbao's. The woman told Ramey she had a bill of sale for the calves from Bilbao, but had forgotten to bring it with her and would mail it to him. As a result, Ramey made his check payable to both Bilbao and Keppner. Ramey, who was elderly, could not identify at the preliminary hearing or at trial whether Hadden was the woman who was present at the transaction. Likewise, the brand inspector could not identify Hadden with certainty as the woman present at the transaction.

At trial, Keppner testified that Hadden, whom he had known for approximately four to five years, contacted him and indicated she was going through a divorce and wanted to sell some cattle without her husband knowing. He further testified that early one morning, he accompanied Hadden, her sixteen-year-old son, and her son's teenage friend in Hadden's pickup truck and trailer to a ranch in Butte County, Idaho, where they backed up to a corral and loaded twenty cattle into the trailer. Keppner testified the group took the cattle to Ramey's ranch, where they received a check made out to him and Bilbao for approximately $8500. Keppner cashed the check (apparently without Bilbao's endorsement) and gave the money to Hadden, who gave him $2,900 she owed him and kept the rest. On cross-examination, Keppner was confronted with the fact he had testified at the preliminary hearing that only Hadden's son and the son's friend accompanied him to the Butte County ranch to load the cattle, as well as other inconsistencies.

Hadden's son, fifteen years old at the time of trial, testified that Hadden discussed with both him and Keppner a plan to steal cattle because she needed money. He also testified that Hadden accompanied him, his friend, and Keppner to pick up the cows from a corral and to sell them to Ramey, and that Keppner cashed the check and gave part of the money to Hadden. Hadden's son also admitted he had testified at the preliminary hearing that his mother had not been present when they picked up the cattle--a "story" Hadden told him to say. Additionally, he

2

also admitted to other inconsistencies between his preliminary hearing and trial testimony and that he was given immunity in exchange for his truthful trial testimony.

In closing argument, Hadden contended the jury should disregard the testimony of Keppner and Hadden's son based on the numerous contradictions within their individual accounts and between their accounts at the preliminary hearing and at trial. Upon a jury verdict of guilty, Hadden was convicted of grand theft. Idaho Code §§ 18-2403(1), 18-2407(1)(b). She now appeals, asserting the court erred in instructing the jury and in denying her motions for change of venue.

## II.

## ANALYSIS

### A.    Jury Instruction

Hadden contends the district court committed fundamental error in giving the jury an erroneous instruction that impermissibly restricted the jury's province to weigh the credibility of witnesses and the evidence. This erroneous instruction, she contends, prejudiced her because she had argued the jury should disregard the testimony of both Keppner and Hadden's son, but the instruction limited the jury's ability to do this to the extent they were corroborated by other witnesses.

The question of whether the jury has been properly instructed is a question of law over which we exercise free review. *State v. Severson*, 147 Idaho 694, 710, 215 P.3d 414, 430 (2009). When reviewing jury instructions, we ask whether the instructions as a whole, and not individually, fairly and accurately reflect applicable law. *State v. Bowman*, 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct. App. 1993). We presume the jury followed the district court's instructions. *See State v. Kilby,* 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct. App. 1997); *State v. Hudson*, 129 Idaho 478, 481, 927 P.2d 451, 454 (Ct. App. 1996).

The court gave the following instruction to the jury, which Hadden contends is an improper version of the common law rule of "*falsus in uno, falsus in omnibus*"[1]:

> You are instructed that a witness may be impeached by contradictory evidence or by evidence that the witness has made, at other times, statements inconsistent with the witness' testimony given on the witness stand.

---

[1]    This phrase translates as "false in one thing, false in everything." *See Kinard v. United States*, 416 A.2d 1232, 1233-34 (D.C. 1980).

3

You are further instructed that if a witness is successfully impeached, or if the jury believes from the evidence that a witness has willfully sworn falsely during the trial as to any matter or thing material to the issues in the case, then the jury is at liberty to disregard the witness' testimony, *except insofar as the witness has been corroborated by other credible evidence or by facts and circumstances appearing during the trial*.

(Emphasis added).  Hadden contends the final clause of the instruction is an "incorrect statement of the law that unduly restricted the jury's inherent powers to judge the weight and credibility of the evidence" and, therefore, was a violation of her Sixth Amendment right to a jury determination.

Ordinarily, a party may not claim a jury instruction was erroneous unless the party objected to the instruction prior to the start of jury deliberations.  Idaho Criminal Rule 30(b).  However, even absent a timely objection to the trial court, a narrow exception exists for those issues rising to the level of fundamental error.  *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010); *State v. Reid*, 151 Idaho 80, 83-84, 253 P.3d 754, 757-58 (Ct. App. 2011).  In *Perry*, the Idaho Supreme Court clarified the fundamental error doctrine applicable where an alleged error was not followed by a contemporaneous objection:

Such review includes a three-prong inquiry wherein the defendant bears the burden of persuading the appellate court that the alleged error:  (1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless.  If the defendant persuades the appellate court that the complained of error satisfies this three-prong inquiry, then the appellate court shall vacate and remand.

*Perry,* 150 Idaho at 228, 245 P.3d at 980.

Here, for the reasons explained below, we conclude the error complained of was not fundamental because the second prong, requiring that the error plainly exists, was not met; thus, we need not address the remaining prongs.  With respect to this second prong of the *Perry* test, the error "must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision . . . ."  *Id*. at 226, 245 P.3d at 978.  Because our Supreme Court drew heavily upon the federal plain error doctrine in arriving at the *Perry* definition of fundamental error, we consult federal case law in elucidating the second element of the *Perry* test.  According to the

4

United States Supreme Court's decision in *United States v. Olano*, 507 U.S. 725 (1993), "'plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Id.* at 734. Thus, the inquiry is whether "the error is clear under current law," *id.*, or, as articulated by the Ninth Circuit Court of Appeals, whether the "available authorities provide a clear answer to the question . . . ." *United States v. Thompson*, 82 F.3d 849, 855 (9th Cir. 1996). In *Thompson*, the court held that an issue raised for the first time on appeal was not "plain error" because there was at least some room for doubt about the outcome of the issue since there was no controlling United States Supreme Court precedent and the other circuits were split. *Id.* at 856. *Accord United States v. Salinas*, 480 F.3d 750, 759 (5th Cir. 2007) (holding there was not "plain error" where the circuit's law was unsettled on the issue and other circuits had reached divergent conclusions); *United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999) (holding where no precedent clearly resolved the defendant's claim of error, the error was not "obvious" and could not be reviewed under the plain error doctrine); *United States v. Alli-Balogun*, 72 F.3d 9, 12 (2d Cir. 1995) (holding that a claimed error could not be plain error when the Supreme Court and the Second Circuit had not spoken on the subject and the authority in the other circuits was split). We, therefore, conclude the second element of the *Perry* test for fundamental error, requiring the error plainly exist, necessitates a showing by the appellant that existing authorities have *unequivocally* resolved the issue in the appellant's favor.

Such is not the case here. While we acknowledge the possible problems attendant to use of the instruction, as Hadden concedes, Idaho appellate courts have never disavowed the use of this instruction. In fact, the instruction was discussed favorably in its last mention. *See State v. Brown*, 94 Idaho 352, 355, 487 P.2d 946, 949 (1971), *overruled on other grounds by State v. Flint,* 114 Idaho 806, 761 P.2d 1158 (1988). Nor do we find merit in Hadden's contention that we should nonetheless find that use of the instruction was plain error because the instruction has not been addressed by our appellate courts for several decades and is not included in the current version of Idaho's model jury instructions, an absence, she contends, most likely attributable to the fact that this instruction has been nearly universally criticized in all jurisdictions called upon to examine its usage.

Thus, while there may be merit in Hadden's argument that the instruction should not be used, we are precluded by the doctrine of plain error from reaching the merits of the issue because there remains some doubt as to the outcome of the issue. On one hand, an Idaho court

5

could reaffirm the use of the instruction and conclude that such an instruction is merely an acceptable statement of the "obvious" premise that a jury need not reject an impeached witness's entire testimony if there is reason not to. On the other hand, an Idaho court could join those jurisdictions that have abandoned use of the instruction as inaccurate and/or confusing. Thus, the error was not "plain." Accordingly, this issue is not one of fundamental error under the *Perry* standard that we can consider for the first time on appeal and we do not reach the merits.

**B.     Venue**

Hadden also contends the district court erred in denying her two motions for change of venue, which resulted in a violation of her constitutional rights to a fair trial and to an impartial jury granted in the Sixth Amendment to the United States Constitution and Article I, § 7 of the Idaho Constitution. Specifically, she contends the district court erred in not finding the circumstances were such that there existed presumptive prejudice against her which necessitated a change a venue.

A motion to change venue pursuant to Idaho Criminal Rule 21(a) is addressed to the discretion of the trial court. *State v. Yager*, 139 Idaho 680, 687, 85 P.3d 656, 663 (2004); *State v. Winn*, 121 Idaho 850, 856, 828 P.2d 879, 885 (1992); *State v. Needs*, 99 Idaho 883, 890, 591 P.2d 130, 137 (1979). Therefore, this Court employs an abuse of discretion standard when reviewing a district court's ruling on a motion to change the venue. *State v. Sheahan*, 139 Idaho 267, 278, 77 P.3d 956, 967 (2003); *State v. Jones*, 125 Idaho 477, 484, 873 P.2d 122, 129 (1994). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). We review claims that a defendant's constitutional rights have been violated de novo in light of the facts of the individual case. *State v. Kellis*, 148 Idaho 812, 814, 229 P.3d 1174, 1176 (Ct. App. 2010).

The validity of a court's decision to try a case in a particular venue is tested by whether, in the totality of existing circumstances, juror exposure to pretrial publicity resulted in a trial that was not fundamentally fair. *Yager*, 139 Idaho at 687, 85 P.3d at 663; *State v. Hyde*, 127 Idaho 140, 145, 898 P.2d 71, 76 (Ct. App. 1995). Publicity by itself does not require a change of

6

venue, *Yager*, 139 Idaho at 687, 85 P.3d at 663; *State v. Bitz*, 93 Idaho 239, 243, 460 P.2d 374, 378 (1969), and error cannot be predicated on the mere existence of pretrial publicity concerning a criminal case. *Yager*, 139 Idaho at 687, 85 P.3d at 663; *Hyde*, 127 Idaho at 145, 898 P.2d at 76. However, a defendant's inability to make a detailed and conclusive showing of prejudice is not a proper ground for refusing to change venue as prejudice seldom can be established or disproved with certainty. *State v. Hall*, 111 Idaho 827, 829, 727 P.2d 1255, 1257 (Ct. App. 1986). Rather, it is sufficient for the accused to show there was a reasonable likelihood prejudicial news coverage prevented a fair trial in violation of the Sixth Amendment to the United States Constitution. *Sheahan*, 139 Idaho at 278, 77 P.3d at 967; *Hall*, 111 Idaho at 829, 727 P.2d at 1257. Where it appears the defendant actually received a fair trial and there was no difficulty experienced in selecting a jury, the denial of defendant's motion for change of venue is not a ground for reversal. *Yager*, 139 Idaho at 687, 85 P.3d at 663; *Needs*, 99 Idaho at 890, 591 P.2d at 137.

In determining whether a criminal defendant actually received a fair trial, this Court considers, among other factors: the existence of affidavits indicating prejudice or an absence of prejudice in the community where the trial took place; the testimony of the jurors at jury selection regarding whether they had formed an opinion based upon adverse pretrial publicity; whether the defendant challenged for cause any of the jurors finally selected; the nature and content of the pretrial publicity; and the amount of time elapsed between the pretrial publicity and the trial. *Needs*, 99 Idaho at 890, 591 P.2d at 137. When reviewing the nature and content of the pretrial publicity, this Court is concerned with the accuracy of the pretrial publicity, the extent to which the articles are inflammatory, inaccurate, or beyond the scope of admissible evidence, the number of articles, and whether the jurors were so incessantly exposed to such articles that they had subtly become conditioned to accept a particular version of the facts at trial. *Sheahan*, 139 Idaho at 278, 77 P.3d at 967; *Hall*, 111 Idaho at 829–30, 727 P.2d at 1257–58. A prospective juror's assurance that he or she is impartial is a consideration in reviewing the record, although such an assurance is not dispositive. *Sheahan*, 139 Idaho at 278, 77 P.3d at 967; *Hall*, 111 Idaho at 830, 727 P.2d at 1258.

In addressing Hadden's motion for change of venue prior to trial, the district court noted the pretrial publicity largely related to a separate, unrelated incident that arose during the pendency of the grand theft charge where Hadden, her minor son, and her son's sixteen-year-old

7

friend were implicated in the shooting of Craig Hadden. Media reports included coverage of the allegations that Hadden's son's friend attempted to kill Craig Hadden at Hadden's request and that Hadden then told a confidential informant that she "planned" the attack on her former father-in-law, "sat above [Craig Hadden's] house for two weeks watching his movements," and "told the boys where to park and where to shoot from." Reporting indicated she undertook the scheme in order for her son to inherit "millions of dollars." Several of the articles indicated Hadden was observed "in an intimate embrace" with her son's friend after the shooting and GPS tracking evidence indicated she was spending "late nights and early mornings at [the boy's] house when his parents either were away or sleeping." Media reports also indicated police believed Hadden attempted to hire an undercover federal agent to kill a local police officer for $10,000. As a result of these two incidents, she was charged with aiding and abetting attempted first degree murder of Craig Hadden and solicitation of first degree murder of a police officer. Finally, several of the news accounts revealed Hadden "has a criminal record dating to 1996 that includes grand theft, forgery and illegal possession of a weapon." The court noted that while several of the articles made reference to Hadden's grand theft charge for stealing cows, none of the articles contained any specifics of the case.

In addition to noting the twelve news articles submitted to the court, the court summarized Hadden's affidavit where she stated she "has lived in Shoshone for many years" and "is well known to many people in the area" and as a result "does not believe she will be given a fair and impartial trial in Lincoln County, Idaho or in the Magic Valley." Her attorney averred "there has been extensive media coverage, particularly of the preliminary hearing" and "he does not believe that [his] client can be given a fair and impartial trial in the Magic Valley area." He also stated that various people in the "Twin Falls area" have asked him about the case and appeared to have formed opinions of guilt as to his client.

After summarizing the applicable law, the district court denied the motion, stating:

> The defendant has not presented any direct evidence of any bias or prejudice against her within the community itself and the mere fact that she has resided in the community for many years does not imply that the jury would be biased or prejudiced against her. There is no evidence that there has been any publicity of the facts surrounding the grand theft charge or that the community has formed any opinions of any kind as to the defendant's guilt or innocence of this pending charge. This court does recognize that "[P]rejudice seldom can be established or disproved with certainty" and that "it is sufficient for the accused to show 'a reasonable likelihood that prejudicial news [coverage] prior to trial will

8

prevent a fair trial.'" *State v. Hall*, 111 Idaho 827, 829, 727 P.2d 1255, 1257 (Ct. App. 1986). . . .

> At this stage of the proceeding there are no affidavits indicating prejudice or an absence of prejudice in the community other than the conclusory opinions of the defendant and her counsel. It will only be at the commencement of voir dire that the court and the parties will be able to determine if any of the prospective jurors have formed an opinion based upon adverse pretrial publicity. During voir dire the defendant will have the opportunity to challenge for cause any of the prospective jurors. As indicated above all of the pretrial publicity has been unrelated to the pending charge of grand theft and the nature and extent of that publicity has generally been factual in nature but again unrelated to the grand theft charge. The trial in this matter was to have commenced on July 22, 2009 and has been vacated by the parties and the defendant has waived her speedy trial rights and it is anticipated that there will be a significant amount of time that will have elapsed between the pretrial publicity and the trial.
>
> . . . .
>
> According to the State there are approximately 2700 qualified jurors in Lincoln County and that there are approximately 400 jurors serving at the present time. This should be an adequate pool of jurors to obtain at least 13 impartial jurors for this trial. The evidence is insufficient at the present time that pretrial publicity unrelated to the pending charge of grand theft will prevent the defendant from obtaining a fair and impartial trial.

Prior to jury selection, the district court issued an order regarding jury selection and venue, setting out the process to be followed. Specifically, the court ordered up to 160 potential jurors be called--eighty on the first day, with an additional eighty potential jurors available the next day. If, after the first day, a panel of at least twenty-seven potential jurors remained after challenges for cause, the parties would exercise their peremptory challenges and would select a jury. But, if there were fewer than twenty-seven eligible jurors remaining after the first day, the next eighty potential jurors would be called. If a total of twenty-seven eligible jurors could not be found after both days, the court would order the venue be changed to Jerome County.

After the parties exercised their challenges for cause on the first day, thirty-two potential jurors remained. However, defense counsel refused to pass the jury for cause and again renewed Hadden's request for a change of venue. Addressing the motion, the district court noted about twenty of the existing panel of thirty-four, at the time the question of pretrial publicity was raised, indicated they had heard about the other pending charges against Hadden. Only one potential juror was excused, when he indicated his friendship with Craig Hadden would color his judgment. The remaining potential jurors all indicated the information they had heard about the

9

other charges would not affect their ability to fairly consider the present case--even after repeated questioning by defense counsel. The court then denied the motion, indicating its belief that the circumstances of the case, including the fact the other charges were merely pending and Hadden had not yet been convicted, were such that it would take the jurors at "their word" and not assume they could not separate the cases and operate fairly in this instance.

On appeal, Hadden contends the circumstances of this case require a presumption of prejudice, specifically pointing to the following factors: the sparsely populated rural nature of Lincoln County; the fact many of the potential jurors were familiar with her and her son's involvement in the attempted murder case, as well as the instant case; the "inflammatory" nature of the pretrial publicity due to the lurid details exposed; the relatively short amount of time passing between the height of the media coverage and her trial; the fact the jury convicted her as charged; and defense counsel's refusal to pass the jury for cause. Hadden bases her contentions largely on the pretrial publicity analysis recently conducted by the United States Supreme Court in *Skilling v. United States*, ___ U.S. ___, 130 S. Ct. 2896 (2010). There, the defendant was a top executive in Enron, a Houston-based company that filed for bankruptcy in 2002. After Enron filed for bankruptcy, investigators discovered an elaborate conspiracy to deceive investors about the state of Enron's fiscal health. Local and national media coverage of Enron's collapse reached a fever pitch, and after being charged with malfeasance in the affair, Skilling filed a motion for a change of venue under Federal Rule of Criminal Procedure 21(a), arguing both presumed and actual jury bias based on the extensive publicity surrounding the case.

Addressing Skilling's contention that a change of venue was required due to a presumption of prejudice, the Supreme Court first examined its previous cases where it had found the presumption of prejudice existed. In the preeminent case, *Rideau v. Louisiana*, 373 U.S. 723 (1963), the defendant robbed a bank in a small Louisiana town, kidnapped three bank employees, and killed one. Without informing Rideau, police filmed their interrogation of him and obtained his confession. Then, on three separate occasions shortly before the trial, a local television station broadcast the film to audiences in numbers ranging from 24,000 to 53,000. Rideau moved for a change of venue, arguing he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000. The motion was denied; however, the U.S. Supreme Court reversed on appeal, noting that when the community saw Rideau, he was in jail, flanked by the sheriff and two state troopers, admitting in detail to the

10

crimes. *Id*. at 725. To the tens of thousands of people who saw the broadcasts, the Court surmised the interrogation "in a very real sense *was* Rideau's trial--at which he pleaded guilty." *Id*. at 726 (emphasis added). Accordingly, the *Rideau* Court did "not hesitate to hold" prejudice should be presumed. *Id*. at 727.

The *Skilling* Court also noted that in two subsequent decisions, *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court also held media coverage led to a presumption of prejudice; but the Court was quick to point out that in both cases more than just heated pretrial reporting was present. Rather, in both cases the coverage spilled over into the trial proceedings, creating a "carnival atmosphere," *Skilling*, ___ U.S. at ___, 130 S. Ct. at 2914-15 (quoting *Sheppard*, 384 U.S. at 358), that pervaded the pretrial hearings and led to convictions obtained in a trial atmosphere that was utterly corrupted by press coverage. *Skilling*, ___ U.S. at ___, 130 S. Ct. at 2914-15.

Summarizing the above cases, the Court recognized "most cases of consequence garner at least some pretrial publicity." *Id*. at ___, 130 S. Ct. at 2913. However, a "presumption of prejudice," requiring a change of venue, "attends only the extreme case." *Id*. at ___, 130 S. Ct. at 2915. The test for the "extreme case" remains whether the trial atmosphere has been "utterly corrupted by press coverage." *Id*. at ___, 130 S. Ct. at 2914. Turning to the facts of the *Skilling* case, the Court concluded there was no basis to presume juror prejudice, noting important differences separated *Skilling* from *Rideau*, *Estes*, and *Sheppard*. The Court based this conclusion on four primary considerations, the first being the "size and characteristics of the community in which the crime occurred." *Id*. The Court contrasted the population of Houston, the fourth most populous city in the country with more than 4.5 million residents eligible for jury service, with the parish in Rideau, concluding that, given the large, diverse pool of potential jurors in Houston, "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id*. at ___, 130 S. Ct. at 2915.

Second, the Court noted that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," unlike, for example, Rideau's "dramatically staged admission of guilt [which] was likely imprinted indelibly in the mind of anyone who watched it." *Id*. at ___, 130 S. Ct. at 2916 (citing *Parker v. Randolph*, 442 U.S. 62, 72 (1979), *overruled on other grounds by Cruz v. New York*, 481 U.S. 186 (1987) ("[T]he

defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him."). The Court concluded the pretrial publicity about Skilling was "less memorable and prejudicial" and "[n]o evidence of the smoking-gun variety invited prejudgment of his culpability." *Skilling*, ___ U.S. at ___, 130 S. Ct. at 2916.

Third, the *Skilling* Court noted that, unlike the cases in which trial "swiftly followed a widely reported crime," over four years had elapsed between Enron's bankruptcy and Skilling's trial. *Id*. And while the Court acknowledged reporters covered Enron-related news throughout this period, "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id. Cf. Rideau*, 373 U.S. at 724 (noting that approximately two weeks after his confession was aired numerous times, Rideau was arraigned and his lawyers promptly filed a motion for change of venue). Finally, the *Skilling* Court noted that it was "of prime significance" that Skilling's jury, while convicting him of some charges, also acquitted him of others. This was also in contrast to *Rideau*, *Estes*, and *Sheppard*, where the jury verdicts did not undermine in any way the supposition of juror bias. *Skilling*, ___ U.S. at ___, 130 S. Ct. at 2916.

In short, the Court concluded Skilling's trial "share[d] little in common with those in which we approved a presumption of juror prejudice." *Id*. Although the Fifth Circuit Court of Appeals reached the opposite conclusion based primarily on the magnitude and negative tone of media attention directed at Enron, the Court noted that "pretrial publicity--even pervasive, adverse publicity--does not inevitably lead to an unfair trial." *Id*. (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). The Court reasoned that, as it had noted, news stories about Enron did not "present the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice" and Houston's size and diversity "diluted the media's impact." *Skilling* ___ U.S. at ___, 130 S. Ct. at 2916.[2]

---

[2] Although the parties dispute the significance of the "factors" discussed by the *Skilling* Court in our analysis here, we think it is clear that *Skilling* does little, if anything, to alter our established caselaw on the issue of whether prejudice must be presumed. In fact, it is nearly identical, mirroring the general inquiry into the community, nature of the publicity, voir dire, and the passage of time. As we indicated in *Yager*, the relevant factors explicitly listed in Idaho caselaw are to be considered, *among other factors*, which would certainly include the queries discussed in *Skilling*. To the extent that Hadden suggests the four considerations discussed in *Skilling* are to be considered to the exclusion of other factors, she is mistaken--a reading of the case makes it clear that the Supreme Court was not intending to articulate a rigid "test" but

Idaho courts have addressed this issue numerous times. In *Hall*, 111 Idaho 827, 727 P.2d 1255, the appellant was charged with first degree murder and aggravated battery after two men were shot dead and one was critically wounded following a fight outside a Rexburg bar. The shootings were "extensively publicized" by the local news media, but the district court denied Hall's motion for a change of venue. On appeal, we first noted Hall did not present any affidavits demonstrating community prejudice arising from media coverage of the case and he had, through counsel, engaged in extensive voir dire of the prospective jurors. Specifically, sixty-five potential jurors were questioned, and of those, twenty-nine were individually sequestered in the judge's chambers and queried on the record as to their exposure to pretrial publicity. While all expressed some recall of news stories regarding the case, their recollections were vague and nonspecific. Only one person said he had formed an opinion as to Hall's culpability and that potential juror was dismissed for cause. Both the defense and prosecution used every available peremptory challenge, but the record did not indicate the defense expressed dissatisfaction with the final twelve jurors.

In regard to the nature of the news coverage, we noted that although it had been widespread, it was largely "factual and noninflammatory" with one arguable exception in a news broadcast, which we concluded had not caused harm as none of the jurors expressed any recollection of the broadcast. Moreover, we noted the "bulk" of the media coverage occurred within two months of the shootings and the trial did not commence until nearly a year had elapsed. In addition, there was no showing the jurors were "incessantly exposed" to relevant news stories throughout the pretrial period--instead, it was apparent the intensity of the initial coverage was dissipated by the passage of time. We concluded that where the district court engaged in a comprehensive and legally consistent analysis, it did not abuse its discretion in denying the motion to change venue. *Id*. at 831, 727 P.2d at 1259.

rather, simply conducting an analysis consistent with the flexible inquiry that characterizes caselaw, including Idaho's, on this issue.

13

In *Sheahan*, the defendant was charged with killing a bail bondsman in Pinehurst, Shoshone County,[3] who was attempting to apprehend him. *Sheahan,* 139 Idaho at 272, 77 P.3d at 961. He appealed the district court's denial of his motion for change of venue based on his contention that he was denied a fair and impartial jury due to juror exposure to pretrial publicity, pervasive community prejudice, the short amount of time between publicity and trial, and the extent of the governmental influence on the publicity. In support of his arguments, he produced several newspaper articles from Pinehurst and neighboring areas which contained some information that may have been incorrect and information ultimately excluded at trial. The district court found the articles to be mostly factual and determined the five months that passed since the pretrial publicity weakened the effect of the media coverage. *Id*. at 278, 77 P.3d at 967. The court also determined any tainting of the jury pool could be addressed and resolved through jury selection. The Idaho Supreme Court concluded the district court properly exercised its discretion in denying the change of venue, as the record supported the court's determination that a fair and impartial jury could be, and was, impaneled for trial despite the pretrial publicity. *Id*. at 278-79, 77 P.3d at 967-68. Specifically, the Court noted the district court judge, the defense, and prosecution all questioned the jurors regarding pretrial publicity and the district court struck three individuals for cause because they formed opinions on the case as a result of the media coverage. Of the twelve jurors and two alternates who were seated, only two had read any newspaper coverage of the incident and both affirmed the coverage would not affect their ability to judge the case on the facts.[4]

In *Yager*, the defendant was charged with murder after shooting a state trooper multiple times, including at point blank range, in Coeur d'Alene. *Yager*, 139 Idaho at 683, 85 P.3d at 659. In support of his motion to change venue, he submitted a binder containing collected publicity regarding the case, consisting of coverage of the shooting; the funeral of the state trooper; the impact of her death on the trooper's family; information about Yager's history and speculation as to his motive for the shooting; quotes from then Governor Batt commenting on the

---

[3]     According to the U.S. Census Bureau, the population of Shoshone County was 13,771 in 2000 and 12,765 in 2010.

[4]     The Court also noted that Sheahan did not challenge any of the jurors for cause, a fact which has been held to indicate satisfaction with the jury as finally seated. *State v. Sheahan,* 139 Idaho 267, 279, 77 P.3d 956, 968 (2003).

murder; and the prosecutor, and various letters to the editor, calling for Yager to explain himself and calling for proper punishment. He argued the publicity was prejudicial to him and created juror bias that did not dissipate with the passage of time considering the "minimal" six-month period between the publicity and the trial.

At voir dire, which was conducted by the trial judge with each potential juror individually, thirty out of seventy-six jurors admitted they had formed the opinion that Yager was guilty, that police had arrested the culprit, or that the fact he was being prosecuted indicated Yager had some connection to the case. Fifteen of the thirty jurors were excused for cause, but defense counsel's challenges to the remaining fifteen were overruled. All peremptory challenges were exercised, after which the defense renewed its motion that the panel still contained persons who were not impartial due to the impact of pretrial publicity.

The district court concluded the media coverage was "by and large . . . both factual and non-inflammatory" and the fifteen jurors who were not excused all stated to the trial judge that they could set aside any opinions they had formed from news accounts. The Idaho Supreme Court concluded Yager failed to show the setting of the trial was "inherently prejudicial" or that actual prejudice could be inferred from the jury selection process of which he complained, and therefore, the district court did not abuse its discretion in denying the motion. *Id*. at 688, 85 P.3d at 664.[5]

In *Needs*, the defendant was charged in Ada County with the murder of her husband after officials discovered a torso, without head and arms, partially burned. *Needs*, 99 Idaho at 885, 591 P.2d at 132. Needs moved for a change of venue before trial on the basis the pretrial publicity surrounding the disappearance of her husband and her arrest and being charged with his murder was so extensive that she could not receive a fair trial in Ada County. She again moved for a change of venue after voir dire on the ground that every juror to be sworn in the case testified that she/he had been exposed to publicity regarding the circumstances of the case. The district court denied the first motion, noting the length of time between the publicity and the trial was considerable, and declined to grant the second motion until the defense could demonstrate

---

[5] The Court also noted the evidence against Yager was "overwhelming." *State v. Yager*, 139 Idaho 680, 688, 85 P.3d 656, 664. Although such is not necessarily the case here, *Yager* remains helpful in that, even excluding this factor, the Supreme Court found the setting of the trial was not inherently prejudicial. *Id*.

the jurors actually remembered specific details of the publicity which would interfere with their fair consideration of the case. After voir dire, the trial court again denied the motion, stating there was no showing of a pervasive feeling of hostility or guilt towards the defendant, with the judge noting he personally questioned the panel and, to his satisfaction, it was composed of persons whose memories with respect to the pretrial publicity were quite limited.

On appeal, Needs argued that while the jurors professed impartiality at voir dire, their general recollections of the case as gained from past media reports were "bound to have at least a subconscious, adverse impact [on] their deliberations." *Id*. at 890, 591 P.2d at 137. In addressing the issue, the Idaho Supreme Court first noted that at voir dire, the trial judge asked the panel if any one of them remembered having read or heard anything about the case and, of the prospective jurors who answered in the affirmative, two were disqualified because of bias they had developed against the defendant as a result of past media accounts. Regarding the three other prospective jurors who indicated they remembered specific details of the media coverage, after extensive questioning by the judge, defense and prosecution, it became apparent their recollections were very hazy at best. In addition, each stated he was willing and able to put the media coverage out of his mind and decide the case on the evidence at trial. The Court determined that, based on this record, it was evident the district court "made every effort to ensure the empanelling of an impartial jury" and there was no indication of the actual existence in any one juror's mind of an opinion which would raise a presumption of partiality. *Id*. at 891, 591 P.2d at 138.

Finally, the Supreme Court noted the trial began some five months after the newspaper articles submitted by the defendant were published and "[u]nder such circumstances it appears that the intervening five months dissipated whatever prejudicial impact those articles may have had." *Id*. Further, there was no indication by any of the jurors otherwise, and there were no editorials or opinions expressed in those articles which would have, in the Court's view, aroused feelings of passion in the public. *Id*. On this basis, where there appeared to be no difficulty in selecting the jury, the Court concluded Needs received a fair trial, and because Needs failed to show the setting of the trial was inherently prejudicial, the district court did not abuse its discretion in denying the motion to change venue. *Id*.

Turning to the facts of the instant case, we first examine what occurred at voir dire--specifically, the testimony of potential jurors regarding whether they had formed an

opinion based upon adverse pretrial publicity and whether defense counsel challenged any of the final jurors for cause. *See Yager*, 139 Idaho at 687, 85 P.3d at 663. The record indicates that when jury selection commenced, out of approximately sixty-three potential jurors initially present, approximately fifteen indicated they knew something about the case from either a combination of press reports and discussion with others, or press reports alone.[6] Those jurors who had both a personal connection to parties in the case, as well as having read press reports, were almost entirely dismissed for cause. The remaining twelve jurors who were familiar with the case through media reports and/or discussion of these media reports with others, were each asked whether anything they knew would render them unable to be impartial. Almost all indicated they could be impartial--the several that couldn't were dismissed for cause.[7]

Later in the process, approximately twenty potential jurors, of the existing panel of thirty-four, indicated they knew who had been charged in the attempted murder of Craig Hadden. Those potential jurors were asked whether they could be fair to Hadden in the instant case, even knowing she was a defendant in Craig Hadden's case, and all but one potential juror answered in the affirmative. The lone potential juror was excused when he indicated his friendship with Craig Hadden would color his judgment. The remaining potential jurors *all* indicated the information they had heard about the other charges would not affect their ability to fairly consider the present case--even after repeated questioning by defense counsel. Ultimately, four jurors who indicated they had read press articles about the case *and* also knew Hadden had been charged in Craig Hadden's case--but indicated they would be able to remain impartial--were seated on the jury. Defense counsel didn't challenge any of the four for cause individually (although, as indicated above, counsel did refuse to pass the jury for cause prior to selection of the actual jury).

As the voir dire transcript demonstrates, each of the panelists in this case convinced the trial court he or she could be fair and impartial--that is, each agreed he or she could determine

---

[6]     It is not entirely clear from the record whether the jurors answering in the affirmative were all familiar with this precise case from media reports, or whether their professed familiarity was with the defendant herself through the media reports concerning the attempted murder case.

[7]     One of those was dismissed for cause based on his background in law enforcement which led him to believe persons charged with crimes are generally guilty, not the fact he had read newspaper articles.

17

whether Hadden was guilty based only upon the evidence presented at trial--upon repeated questioning by the parties. Nor are we left with the impression, after reading the transcript, that there was a "pervasive feeling of hostility or guilt towards the defendant," as very few potential jurors indicated they would not be able to judge the case fairly and those persons were quickly dismissed for cause. *Accord Needs*, 99 Idaho at 889, 591 P.2d at 137. The remaining potential jurors seemed to have little difficulty indicating they could decide the case only on the evidence presented, and ultimately, only four included in the final panel indicated familiarity with news reports--but indicated they would be able to set aside such influences. Like in *Needs*, it is evident in this case that the district court "made every effort to ensure the empanelling of an impartial jury" and there was no indication of the actual existence in any one juror's mind of an opinion raising a presumption of partiality. *Id*. at 891, 591 P.2d at 138. *Accord Yager,* 139 Idaho at 687-88, 85 P.3d at 663-64 (noting that while thirty of seventy-six jurors admitted they had formed an opinion regarding Yager's guilt and only fifteen were excused for cause, the remaining fifteen stated to the judge that they could set aside any opinions they had formed from news accounts); *Sheahan,* 139 Idaho at 279, 77 P.3d at 968 (noting that the district court judge, the defense, and the prosecution had all questioned the jurors regarding pretrial publicity and struck three persons for cause because they had formed opinions of the case as a result of the media coverage and that of the twelve jurors and two alternates, only two had read any newspaper coverage of the incident and both affirmed the coverage would not affect their ability to judge the case on the facts); *Hall*, 111 Idaho at 830, 727 P.2d at 1258 (noting that defense counsel engaged in "extensive voir dire of prospective jurors" and the only potential juror who indicated he had formed an opinion as to Hall's culpability after reading news reports of the case was dismissed for cause).

Next we examine the nature and content of the pretrial publicity: particularly, the accuracy of the pretrial publicity; the extent to which the articles are inflammatory, inaccurate or beyond the scope of admissible evidence; the number of articles; whether the jurors were so incessantly exposed to such articles that they had subtly become conditioned to accept a particular version of the facts at trial; and the amount of time that passed between the coverage and the trial. *Sheahan*, 139 Idaho at 278, 77 P.3d at 967; *Hall,* 111 Idaho at 829-30, 727 P.2d at 1257-58. In discussing the nature of the publicity at issue, the district court noted that "all of the pretrial publicity has been unrelated to the pending charge of grand theft and the nature and

extent of that publicity has generally been factual in nature but again unrelated to the grand theft charge." On appeal, Hadden does not dispute that the media reports were largely factual; rather, she contends the "information that barraged the close-knit, rural county in which [she] was tried was an exemplar of the type of blatantly prejudicial information warned of in *Skilling*--information that readers or viewers could not reasonably be expected to shut from sight."

Certainly, it is undisputed that the media reports pertaining to Hadden's alleged (at the time) involvement in the attempted murder of her former father-in-law, Craig Hadden, and a police officer contained significant negative information about Hadden, including the attempted murder allegations and the implication she was engaged in an intimate relationship with her son's teenage friend, which almost certainly would not have been admissible at trial on the grand theft charge. We recognize such allegations are inherently of a sensational and unflattering nature; however, such is the case with many allegations of criminal activity. For example, in *Yager*, the extensive pretrial publicity concerned the charges in the case that Yager, for no apparent reason, shot a female state trooper at point-blank range, multiple times, killing her. *Yager,* 139 Idaho at 683, 85 P.3d at 659. Similarly in *Needs*, there was extensive pretrial publicity after officials discovered a partially burned torso, missing a head and arms, and charged Needs with the murder of her husband. *Needs,* 99 Idaho at 885, 591 P.2d at 132. One could argue such facts had the potential to be significantly more inflammatory than those in the present case, as they involved the brutal murder of a law enforcement officer and a suspect's husband, respectively, in horrific fashion and concerned the charges actually at issue in the cases. Yet, in both cases, our Supreme Court held, in conjunction with other factors, the district courts did not err in denying motions for change of venue, concluding the news reports were largely factual and noninflammatory. *Accord Hall*, 111 Idaho at 830-31, 727 P.2d at 1258-59 (noting there had been extensive pretrial publicity of the circumstances surrounding the defendant's charges of first degree murder and aggravated battery, but concluding the publicity was largely "factual and noninflammatory"). Thus, the mere fact the crime(s) reported by the media are gruesome, memorable, etc., does not render the publicity inflammatory to the extent of requiring a change of venue.

Further, while Hadden relies heavily on *Skilling* in asserting the inflammatory nature of the publicity at issue, we note the *Skilling* Court specifically distinguished the publicity in

19

*Skilling* from that in other cases where it had found a presumption of prejudice, stating that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," unlike, for example, Rideau's "dramatically staged admission of guilt [which] was likely imprinted indelibly in the mind of anyone who watched it." *Skilling, ___ U.S.* at ___, 130 S. Ct. at 2916 (citing *Parker*, 442 U.S. at 72)). The *Skilling* Court concluded that concerning the pretrial publicity in that case, "[n]o evidence of the smoking-gun variety invited prejudgment of his culpability." *Id.* Likewise in this case, there was no "smoking-gun" contained in the pretrial publicity concerning the grand theft charge, and to the extent it is relevant, no such evidence regarding the pending charges in the other case.[8] *See also Needs*, 99 Idaho at 891, 591 P.2d at 138 (noting there were no editorials or opinions expressed in the articles which would have, in the Court's view, aroused feelings of passion in the public).

We next examine the quantity of information the jury was exposed to, the level of coverage, and the extent, if any, to which they were "condition[ed] . . . to accept a particular version of the facts at trial." *Sheahan*, 139 Idaho at 278, 77 P.3d at 967. We also examine the amount of time that passed between the coverage and the trial. The record indicates local media covered the shooting of Craig Hadden in April 2009, but that coverage did not mention the defendant. Additional news coverage of the incident followed in June 2009, after the arrest of Hadden and her accomplices for the shooting of Craig Hadden and the subsequent preliminary hearing, which included the details of Hadden's alleged involvement. This amounted to approximately five newspaper and online articles mentioning Hadden's involvement in the attempted murder case over a two-week period in June, approximately five months prior to the commencement of the grand theft trial in November. As the State points out, there was very little mention of the current charges.

We conclude the circumstances present do not indicate a particularly high level of coverage, nor was it sustained over the five month period preceding the grand theft trial--a fact

---

[8]    The *Skilling* Court also distinguished two other cases in which it had found a presumption of prejudice was warranted, *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). Unlike in *Skilling*, in both *Estes* and *Sheppard* more than just "heated" pretrial publicity was present, but rather it had spilled over into the trial proceedings, creating a "carnival atmosphere." *Skilling, ___ U.S. ___, ___* 130 S.Ct. 2896, 2914-15. Hadden does not contend, nor is there any evidence to support as much, that such was the case here.

which Hadden has not alleged. Our Supreme Court has specifically held that five months is sufficient time to weaken the effect of pretrial publicity where such publicity was not sustained in the interim. *See Sheahan*, 139 Idaho at 278, 77 P.3d at 967; *Needs*, 99 Idaho at 891, 591 P.2d at 138. *Cf. Irvin v. Dowd*, 366 U.S. 717, 725 (1961) (in concluding that a change of venue was required, noting the *sustained*, inflammatory media reports during the six or seven months preceding the defendant's trial).

Finally, we take into account the size of the county where the trial was held. Hadden contrasts the population in this case with the large population present in *Skilling* and persistently argues that the disparity indicates a presumption of prejudice should apply. We recognize Lincoln County has a relatively small population, even compared to other rural Idaho counties; the district court noted there were approximately 2700 qualified jurors in the county at the time jury selection took place. However, this fact alone does not require the presumption of prejudice, nor would such a rule be practicable given the relatively rural nature of many of Idaho's counties. *See e.g., Sheahan*, 139 Idaho at 278-79, 77 P.3d at 967-68 (affirming the denial of Sheahan's motion for change of venue where his trial for killing a bail bondsman in Pinehurst, Idaho, was held in Shoshone County (which had a population of approximately 13,700 in 2000)).

Here, it is clear the district court took this issue into consideration when determining whether to grant Hadden's initial motion for change of venue and, as a result, outlined a specific procedure to be followed in choosing a jury, which allowed for a change of venue if a certain number of qualified jurors could not be found. After the parties engaged in extensive voir dire and numerous jurors were dismissed for cause, enough jurors remained for a jury to be chosen under the district court's plan, and the trial proceeded in Lincoln County. Under these circumstances, especially where there is no indication the jurors actually chosen were biased, we do not agree with Hadden that the size of the county was a significant indication amounting to a presumption of prejudice.

In sum, we conclude the district court did not err in not finding a presumption of prejudice and in denying Hadden's motions for a change of venue. Not only was there no indication that it was particularly difficult for a jury to be selected (indeed, a second set of eighty jurors did not even need to be called pursuant to the district court's outline), but it is apparent Hadden received a fair trial upon our assessment of the relevant factors, including the testimony

21

of the jurors exposed to pretrial publicity that they could be unbiased, the relatively factual and noninflammatory nature of the pretrial publicity, the relatively few media reports published five months prior to trial, and the fact the incident was not covered incessantly up to the trial and did not pervade the actual trial atmosphere. In coming to this conclusion, we note the United States Supreme Court's recognition of the trial judge's appraisal:

> When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.
>
> Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record--among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.

*Skilling*, ___ U.S. at ___, 130 S. Ct. at 2917-18 (citations omitted).

### III.

### CONCLUSION

We do not reach the merits of Hadden's assertion that the district court erred in instructing the jury because Hadden has not shown that giving the complained-of instruction is plain error and, therefore, may be addressed for the first time on appeal. We also conclude the district court did not err in denying Hadden's motions for change of venue because we conclude the district court did not err in finding that the presumption of prejudice did not apply. Accordingly, Hadden's judgment of conviction for grand theft is affirmed.

Judge LANSING and Judge MELANSON **CONCUR.**