# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49412

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, February 2024 Term |
| | ) | |
| v. | ) | Opinion filed: June 28, 2024 |
| | ) | |
| MARTIN EDMO ISH, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Rick Carnaroli, District Judge.

The judgment of conviction and sentence are <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Sally Cooley argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Kenneth Jorgensen argued.

---

MOELLER, Justice.

Appellant Martin Edmo Ish was convicted of voluntary manslaughter in 2017 and sentenced to a unified sentence of 15 years with 10 years fixed and five years indeterminate. However, Ish's original conviction was later vacated by this Court in *State v. Ish*, 166 Idaho 492, 461 P.3d 774 (2020). After this Court's opinion became final on May 5, 2020, the district court reinstated Ish's bail. When he was unable to post a bond, he was returned to the Bannock County jail to await his retrial.

While Ish was awaiting his second trial, the Idaho Supreme Court issued a series of orders addressing public safety at jury trials during the COVID-19 pandemic, which postponed the commencement of Ish's second trial several times. Citing speedy trial concerns, Ish repeatedly moved for dismissal of his case, but his requests were denied by the district court. Ish also moved for a change of venue, which had been granted in his first trial. Although the motion was joined by the State, the motion to change venue was denied by the district court.

1

Ish's second trial commenced on July 27, 2021. During voir dire, and again during the evidentiary phase of the trial, Ish moved to strike Juror No. 3, a Bannock County probation officer, for cause. The district court denied both requests to strike the juror.

At the conclusion of his second trial, a jury again convicted Ish of voluntary manslaughter. Ish was sentenced to a fifteen-year unified sentence, the same overall sentence he received before; however, this time the district court ordered that the first 14 years would be fixed with one year indeterminate. This resulted in a fixed sentence four years longer than his original sentence. After the sentence was pronounced, Ish filed a motion to vacate his judgment or, in the alternative, for relief under Idaho Criminal Rule 35. The district court denied Ish's motions.

Ish timely appealed to this Court, asserting seven points of error. For the reasons set forth herein, we affirm Ish's judgment of conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the second trial of Martin Edmo Ish, who was originally convicted of voluntary manslaughter in 2017 for the 2009 death of Eugene Lorne Red Elk. Ish's first conviction was vacated in 2020 in *State v. Ish*, 166 Idaho 492, 461 P.3d 774 (2020) [hereinafter "*Ish I*"], after this Court concluded that the district court erred in its ruling on Ish's challenge to the jury panel under *Batson v. Kentucky*, 476 U.S. 79 (1986). The facts related to the death of Red Elk were previously articulated in *Ish I*, where this Court explained:

> On the evening of June 14, 2009, Ish and some friends were barhopping in Pocatello, Idaho. At one point, the group patronized the Bourbon Barrel until the staff ordered Ish to leave after a confrontation with bar staff. Ish's friends took him a few blocks down the road to Duffy's Tavern. Ish's friends returned to the Bourbon Barrel. When Bourbon Barrel staff learned of Ish's whereabouts, they phoned Duffy's Tavern to inform them of Ish's actions earlier that evening. Upon receiving the call, Red Elk, who was working as a bouncer that night, asked Ish to leave the bar and he complied. A short time later, Red Elk left the bar to visit his girlfriend.
>
> A patron[,] [Narcissus "Narci" Kimball,] drove up to Duffy's Tavern and found Red Elk lying in the parking lot gurgling blood. She alerted the bar, the police were called, and an investigation followed. Red Elk was taken to the local emergency room where it was determined that he had suffered a brain injury from blunt force trauma to the head. He was life-flighted to a medical center in Idaho Falls for surgery. He died three days later.

*Ish I*, 166 Idaho at 497, 461 P.3d at 779 (alteration added). This Court's opinion in *Ish I* was filed on April 13, 2020. Thereafter, the remittitur was issued on May 5, 2020.

2

The remittitur was issued during the early days of the COVID-19 pandemic. In March of 2020, Idaho was under a statewide emergency declaration issued by Governor Brad Little. While the courts of this state remained open throughout the pandemic, restrictions were imposed through a series of emergency orders issued by this Court. These orders were issued in response to the state of emergency, the rising number of COVID-19 cases throughout the state, and mounting concerns for public safety. Under the order in force in May of 2020, the district court was temporarily unable to call jury panels "during the pendency of this Amended Order." *In Re: Idaho Supreme Court Response to COVID-19 Emergency*, Amended Order (Mar. 23, 2020). This Court explained that "[t]his order prohibiting the calling of juries shall be deemed good cause to deny a motion to dismiss a criminal case based upon the time requirements set forth in section 19-3501, Idaho Code." *Id.* The order was extended and remained in effect until September 14, 2020. A later order permitted jury trials to resume provided they met certain safety standards established by the Supreme Court. However, this order authorized the administrative district judge in each judicial district to further suspend jury trials after considering the local rates of outbreak. Accordingly, the suspension of jury trials was extended in Bannock County through September 18, 2020, after which trials in Bannock County briefly resumed until November 9, 2020.

During this first suspension of jury trials, on July 14, 2020, Ish moved the district court for a change of venue. Although the motion was joined by the State, it was later denied by the district court in a written order.

At a hearing on August 12, 2020, in preparation for the resumption of jury trials in Bannock County, there was a discussion between the district court and counsel regarding potential trial dates. In that exchange, counsel for Ish requested the trial be scheduled "as soon as we can have it." The district court ultimately scheduled the trial for December 7, 2020. This trial setting was later vacated by the Idaho Supreme Court's second suspension of jury trials on November 9, 2020, due to a surging wave of COVID-19 cases in Idaho. This Court explained in its order that "data shows that the weekly moving average incidence rate of COVID-19 cases in the state [had] increased from September 13, 2020 to November 8, 2020 by 335%, with an average week over week increase of 21%." *Order Re: Commencement of Jury Trials* (Nov. 9, 2020). We again temporarily suspended all jury trials effective November 9, 2020, and later extended that suspension on December 7, 2020. The suspension of jury trials was finally lifted on March 1, 2021, and jury trials were recommenced throughout the state.

The district court scheduled Ish's trial for April 6, 2021. On March 12, 2021, the State moved to appoint conflict counsel for Ish after a lead prosecutor left the Bannock County Prosecuting Attorney's Office to take a job at the Bannock County Public Defender's Office. Two weeks later, on March 26, 2021, the State moved to vacate the April 6 trial setting. The State explained that Dr. Dennis Minister, the "primary emergency room physician who treated Red Elk," was " 'absolutely unavailable' to attend trial the week of April 6, 2021," due to his surgical schedule and his own health concerns. The State also explained that another witness, Dr. Robert Cach,[1] the neurosurgeon who treated Red Elk at Eastern Idaho Regional Medical Center in Idaho Falls was the only available, on-call trauma surgeon at his medical facility during the period scheduled for trial and "if he were unavailable to treat a patient due to being in court, the patient would have to be diverted to another medical facility and delay emergency treatment." In seeking to postpone the trial, the State added:

> While the [S]tate is sensitive to the fact the defendant's retrial has been substantially delayed due to COVID, the [S]tate would be unable to present its case without the participation of [these] two key medical witnesses, and requests the court consider resetting the matter sometime in June 2021. *Doing so will give the [S]tate ample time to secure the attendance of necessary witnesses.*

(Emphasis added). Importantly, both State's witnesses were frontline medical doctors and Idaho was still under a statewide emergency declaration due to COVID-19.

The same day the State's motion to vacate was filed, Ish filed an objection to the motion to appoint conflict counsel. Three days later, on March 29, 2021, at a hearing on both matters, the district court denied the request for appointment of conflict counsel but approved the State's motion to vacate the trial date. Ish's trial was rescheduled for June 2, 2021. However, without an initial explanation, the district court later vacated the June 2, 2021, setting and rescheduled the trial for July 27, 2021.

On July 20, 2021, Ish again moved for dismissal, asserting a violation of his constitutional right to a speedy trial. Importantly, the district court recognized that Ish asserted his right to a speedy trial:

> I will note for the record that Mr. Andrew has insisted upon Mr. Ish's right to speedy trial from the very beginning at almost every, if not every, juncture when we were

---

[1] Both "Cache" and "Cach" are used in the record. We use the latter because he is referenced that way in the briefing to this Court.

4

talking about trial dates. So it's not an issue of not asking for the speedy trial. I think that's been sought consistently since the beginning.

Two days later, the State again moved to continue the trial "on the grounds . . . that the State previously submitted a motion and affidavit requesting that the court rule that Dr. Charles Garrison is an unavailable witness . . . [and] that Dr. Garrison has serious health issues that prevent him from testifying in the upcoming trial set to begin July 27, 2021."

The district court heard argument on July 22, 2021, and took both matters under advisement, with a decision expected the following day. The district court again noted for the record that Ish had asserted his "right to speedy trial from the very beginning at almost every, if not every, juncture when we were talking about trial dates." The court also explained, for the first time, its reason for the June 2, 2021, continuance:

> And I wanted to state for the record, there were a number of reasons for the June 2 continuance. First and foremost was we were not ready at that point to get the written questionnaire out to the jury pool, so that wasn't ready. And I suppose I could have raised that issue, but that wasn't in at the time. And the number of jurors that were polled by the jury commissioner to begin trials, which I believe the case you talked about, the two-day one, was the first one for Bannock County or one of the first ones for Bannock County in early June, and the jury commissioner had not polled [sic] enough jury members for us to have had enough for a panel. So that's why it was continued on my own motion, and I probably should have made that clear on the record why it was being moved.

> I stayed with the vacation plan that I had, and I did go on vacation. That's why Judge Dunn covered that one trial on the 2nd of June. But if we had been prepared to go, I would have probably had to forgo vacation plans. But I didn't think we were ready to go with this trial, and that's the reason why it was continued on my own motion, so...but I think even with that continuance, we're probably at about the five-month mark, give or take, since we had the opportunity following the lifting of the tolling of the speedy trial provision.

The following day, before the commencement of voir dire, Ish moved for a change of venue, citing information contained in the completed jury questionnaires. Counsel for Ish explained the basis for the motion:

> [B]ased on my count, there are 44 of these jurors that have been exposed to this case through the media. And so I think if the [c]ourt grants -- and I'm prepared to argue it more fully, but I think if the [c]ourt grants that, then there isn't really a need to go through these individual jurors and talk about the dos or don'ts.

5

The district court responded with a question to counsel about a change of venue delaying the trial even further. Counsel for Ish attempted to balance his concern over the jury pool with his client's desire to have the trial as soon as possible:

> I know. And I've -- and I've discussed that this aftern [sic] -- or just a moment ago with Mr. Ish. And between having a trial that we have to do twice because of pretrial publicity or we get into the questioning and have to vacate it after all these jurors are here and just making a decision up front -- I want to have his trial as soon as possible, Mr. Ish wants to have it as soon as possible, but he wants to have it with a pool of his peers that isn't influenced by all the pretrial publicity.
>
> So he understands that, and that's what we're having to balance, Your Honor. The fact that that's going to be -- having a jury that hasn't been exposed to this is more important than just having the trial done.

The district court then asked the State for its perspective on the matter. The State responded that it seemed like "a pretty small number of people that really had any knowledge of this case." After further colloquy, the district court deferred ruling on the motion for a change of venue until voir dire was completed: "I think what we need to do is go through and pick through this panel and see how many we have left by agreement or order today." Later that same day, Ish followed up on his oral motion for a change of venue by filing a written motion.

The following day, the district court took up Ish's renewed motion for a change of venue. The State joined the motion for a change of venue, noting:

> Although the State and defense seldom really agree on much, I think this is an issue that we do agree upon. And I think Mr. Andrew's been articulate in explaining his concerns from his client's perspective. And at the end of the day, the State is also, I believe, responsible for doing what they can to ensure that the defendant has a fair trial. And in this case, given the composition of this jury pool, the State has the same concerns that the defense does. So I would just, for the record, state that the State is joining in the defendant's motion for a change of venue.

Ruling from the bench, the district court denied the motion for a change of venue and the motion to dismiss for a violation of Ish's speedy trial rights. The district court also denied the State's request for another continuance and the trial proceeded to voir dire.

As voir dire progressed, Ish moved to strike Juror No. 3 for cause due to the juror's exposure to media coverage and his employment. On his jury questionnaire, Juror No. 3 indicated that he had been exposed to news coverage of the case. In a follow-up colloquy with counsel during voir dire, Juror No. 3 explained that he had seen a "blip" of coverage, which he explained as "[j]ust once in a while a blip will come up of who they charged or who they arrested." When asked about

6

whether he had any specific knowledge of the case, Juror No. 3 explained: "Yeah, just, like I said there, that there was an altercation at a bar in town, and an individual was killed."

As for his employment, Juror No. 3 explained that he was a probation officer for Bannock County and worked with the Pocatello Police Department on "at least" a weekly basis. The following is an early colloquy between counsel for Ish and Juror No. 3:

> DEFENSE COUNSEL: So, Juror Number 3, what -- for our record, just explain what your experience or what your knowledge is of law enforcement.
>
> PROSPECTIVE JUROR: What my knowledge is of law enforcement?
>
> DEFENSE COUNSEL: Yes.
>
> PROSPECTIVE JUROR: I'm a probation officer for the State of Idaho, and I have a cousin that works for Nampa PD.
>
> DEFENSE COUNSEL: Okay. How often do you deal with police officers in your job?
>
> PROSPECTIVE JUROR: On a weekly basis at least.
>
> DEFENSE COUNSEL: Okay. And what sort of things do you do with them?
>
> PROSPECTIVE JUROR: We can do searches. We can do arrests with them, transports. That's kind of what I can think of off the top of my head.
>
> DEFENSE COUNSEL: So if you had, for instance, somebody that had a warrant or for some other reason needed to go to jail and they were at your office, would you have them come to your office and do the transport?
>
> PROSPECTIVE JUROR: We could, or we could do the transport ourself.
>
> DEFENSE COUNSEL: What about the searches? So they participate in -- is it residential searches?
>
> PROSPECTIVE JUROR: Residential searches or searches of vehicles. We ask them for their assistance in doing those searches, yes.
>
> DEFENSE COUNSEL: Okay. In terms of the variety of officers, I mean, do you deal with the same ones all the time or does it --
>
> PROSPECTIVE JUROR: It's a variety. But you do get to know some a little bit more than others just because a lot of stuff happens on a night shift or on weekends and that tends to be when -- the officers you become a little more familiar with.
>
> DEFENSE COUNSEL: Do you think there's an agency you deal with the most?
>
> PROSPECTIVE JUROR: Probably Pocatello Police Department.
>
> DEFENSE COUNSEL: Okay. And so you said weekly. Maybe once a week? Twice a week? And I'm sure it fluctuates, but...
>
> PROSPECTIVE JUROR: In the current position I'm in, not as much, but probably once every couple weeks.

DEFENSE COUNSEL: Okay. And in your dealings with them -- and I say this only tongue in cheek, but do they have some superpower in determining the truth or doing anything else?

PROSPECTIVE JUROR: No, they don't.

DEFENSE COUNSEL: Okay. Some of them might have some training, correct, that's helpful?

PROSPECTIVE JUROR: Correct.

DEFENSE COUNSEL: Okay. But have you found any of them to be basically a human lie detector?

PROSPECTIVE JUROR: No.

Thereafter, Ish moved to have Juror Number 3 dismissed "for cause because of his business relationship with the prosecutor's office." The district court took the matter under advisement and later ruled from the bench, concluding that neither actual nor implied bias had been established:

> THE COURT: All right. Did a little bit of looking at some Idaho case law, and I'm going to find that there's no actual or implied bias, especially the statutory implied bias under 19-2020 upon which to excuse this juror for cause. I find that we have a fair and impartial juror -- potential juror ready to be seated in Juror Number 3.

Thus, Juror No. 3 remained on the jury panel and was eventually seated as a trial juror.

Ish's trial commenced on July 29, 2021. During the State's case-in-chief, another concern regarding Juror No. 3 was raised. Narcissus "Narci" Kimball testified that she was the person who found Red Elk lying wounded and unconscious outside of Duffy's Tavern. However, Kimball's name was "left off the [jury] questionnaire" filled out before the trial and no juror was questioned during voir dire about their knowledge of or relationship to her. After an inquiry of the jury panel, Juror Number 3 was the only juror who indicated that he knew her. Voir dire was reopened for Juror Number 3, who explained that three to four years prior, he was Narci's husband's probation officer. He explained that he had been to her house and spoke with her about her husband's progress:

> JUROR: We're required to be in their homes once in a while, so -- and I can't even remember. It's been a couple, three years, I think four years since I supervised him. I was in her house maybe once every two, three months. Sometimes she was there; sometimes she wasn't. To be honest, I didn't even recognize her till I saw her husband sitting back there, and that's when I put two and two together.

> PROSECUTOR: But you don't think that would impact your ability to be a juror?

> JUROR: I don't.

8

PROSECUTOR: Okay. Thank you.

THE COURT: Mr. Andrew.

DEFENSE COUNSEL: Do you remember any interactions with her, conversations, anything like that?

JUROR: Not other than if I was in her house, I might have asked her how she felt her husband was doing, how things were going for her, and that's about it.

DEFENSE COUNSEL: And are those sort of standard things you discuss with spouses?

JUROR: Absolutely.

After this discovery, Ish renewed his objection to Juror Number 3, which the district court denied.

At the conclusion of the trial, the jury found Ish guilty of voluntary manslaughter. Ish was later sentenced to 14 years fixed with 1 year indeterminate. Notably, the fixed portion of his sentence was 4 years longer than the original fixed sentence imposed following his first trial. Thereafter, Ish filed a motion to "vacate [the] judgment or in the alternative, [a] motion pursuant to Idaho Criminal Rule 35." The district court denied the motion.

Ish filed a timely notice of appeal and argued seven points of error: (1) Ish's speedy trial rights were violated; (2) the district court erred in denying Ish's motion for a change of venue; (3) the district court erred in denying Ish's motion to strike Juror No. 3 for cause; (4) all of the errors in the aggregate deprived Ish of his right to a fair trial; (5) the district court violated Ish's right to due process when it "imposed a vindictive sentence" following his first successful appeal; (6) the district court abused its discretion by imposing a fifteen year sentence, with fourteen years fixed, following Ish's guilty verdict for voluntary manslaughter in the second trial; and (7) the district court abused its discretion in denying Ish's Idaho Criminal Rule 35 motion in light of the new information he provided.

## II. STANDARDS OF REVIEW

As we have said, "[c]onstitutional issues and the construction and application of legislative acts are pure questions of law over which this Court exercises free review." *Hall v. State*, 155 Idaho 610, 615, 315 P.3d 798, 803 (2013). "Whether there was an infringement of [a defendant's] . . . right to a speedy trial presents a mixed question of law and fact." *State v. Clark*, 135 Idaho 255, 257, 16 P.3d 931, 933 (2000); *State v. Prano*, 170 Idaho 337, 340, 510 P.3d 690, 693 (Ct. App. 2021). We defer to the trial court's "findings of fact if supported by substantial and competent

evidence. This Court, however, exercises free review of the trial court's conclusions of law." *Id.* (citations omitted).

"The Court employs an abuse of discretion standard when reviewing a district court's ruling on a motion to change the venue*." State v. Sheahan*, 139 Idaho 267, 278, 77 P.3d 956, 967 (2003) (quoting *State v. Jones*, 125 Idaho 477, 484, 873 P.2d 122, 129 (1994)). Moreover, we have noted that the scope of the discretion is "broad." *State v. Grube*, 126 Idaho 377, 385, 883 P.2d 1069, 1077 (1994) (citing *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989)) ("[T]he district court has broad discretion to decide whether to remove a juror for cause.).

Sentencing decisions are also highly discretionary, and "[s]o long as the sentence is within the statutory limits, the appellant must show that the trial court, when imposing the sentence, clearly abused its discretion." *State v. Knighton*, 143 Idaho 318, 319, 144 P.3d 23, 24 (2006). Likewise, in reviewing a Rule 35 motion, we have held that when "the basis for the illegality of the sentence is that the sentence is excessive, and the sentence is within the statutory limits, a motion for reduction of sentence under Rule 35 is a plea for leniency, and this Court will then review a denial or grant of the motion for an abuse of discretion." *State v. Draper*, 151 Idaho 576, 601, 261 P.3d 853, 878 (2011) (alteration in original) (citing *State v. Farwell*, 144 Idaho 732, 735, 170 P.3d 397, 400 (2007)). "When presenting a Rule 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the district court in support of the Rule 35 motion." *Id.* (alteration in original) (citing *Farwell*, 144 Idaho at 735, 170 P.3d at 400). "If the sentence was not excessive when pronounced, the defendant must later show that it is excessive in view of new or additional information presented with the motion for reduction." *Knighton*, 143 Idaho at 320, 144 P.3d at 25.

When reviewing discretionary decisions of a trial court, we employ our well-known abuse of discretion standard, which requires us to consider "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Leavitt*, 171 Idaho 757, 525 P.3d 1150, 1157 (2023) (alteration in original) (quoting *State v. Villa-Guzman*, 166 Idaho 382, 384, 458 P.3d 960, 962 (2020)); *see also Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

### III. ANALYSIS

Ish assigns seven points of error, all related to rulings that the district court made before, during and after Ish's trial. We will address each in turn.

**A. Ish's right to a speedy trial was not violated.**

(1) *The right to a speedy trial is renewed during a subsequent trial on remand even if the right was waived during the first trial.*

Before we begin with the application of the speedy trial rule to this case, we note that during oral argument the State expressed disagreement with this Court's recent holding in *State v. Lankford*, 172 Idaho 548, ____, 535 P.3d 172, 184 (2023), arguing that the right to a speedy trial, once waived, is not automatically renewed on remand. Despite recognizing our holding in that case, the State urged this Court to reconsider its holding in *Lankford* and conclude that there is not a "right to a speedy retrial." We decline the State's invitation to reconsider our holding in *Lankford* and refuse to read the speedy trial right, under both the United States Constitution and the Idaho Constitution, so narrowly.

This Court recently articulated the proper analysis for review of an alleged violation of the right to a speedy trial in *Lankford*. In that case, this Court followed a similar analytical framework to that articulated in *State v. Talmage*, 104 Idaho 249, 658 P.2d 920 (1983). *Talmage* concerned a retrial that followed a mistrial. This Court calculated the length of the delay as the time between the mistrial and the second trial: "The interval between the first and second trials in this action, the delay of which defendant complains, was approximately seven and one-half months. A delay of this length is sufficient to trigger our inquiry into whether a defendant has been denied a speedy trial." *Id*. at 252, 658 P.2d at 923. We even used the phrase "speedy retrial" later in that opinion when evaluating whether the right had been violated. *Id*. Thus, our decision in *Lankford* was not the trailblazing, expansion of the speedy trial right that the State suggests it was.

It must also be remembered that a defendant invoking the speedy trial right upon a retrial may have already experienced some level of constitutional error which necessitated a new trial. Under the State's view, a defendant who has experienced a constitutionally deficient trial, served significant prison time, successfully appealed his conviction, and has effectively been restored to a state of innocence should not have his right to a speedy trial restored. Regardless of whether the right was waived in the first trial, the State's position is untenable, manifestly unjust, and runs afoul of the very purpose of the right to a speedy trial. The right ensures that the State does not

11

unduly burden a defendant with oppressive delays under the weight of prosecution from the State itself. Indeed, as the Supreme Court of the United States has said of the speedy trial right: "This guarantee is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Ewell*, 383 U.S. 116, 120 (1966).

While the need for a speedy trial is vitally important to all defendants in all circumstances, it is perhaps even more vital to defendants who have already had years of their life disrupted by a prior conviction that did not meet constitutional standards. Thus, we reaffirm our holding in *Lankford* and reiterate that, just as the presumption of innocence is restored to the defendant on remand, the right to a speedy trial is fully restored upon the issuance of a remittitur.

(2) *Applying the balancing test from* Barker v. Wingo*, Ish's right to a speedy trial was not violated.*

To determine whether a defendant's speedy trial right has been violated, we employ the same balancing test adopted in *Barker v. Wingo*, 407 U.S. 514 (1972). "In applying *Barker*, this Court balances four primary factors identified by the Supreme Court of the United States: '(1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted the right to a speedy trial; and (4) the prejudice to the defendant.' " *Lankford*, 172 Idaho at ___, 535 P.3d at 184 (citing *Clark*, 135 Idaho at 258, 16 P.3d at 934); *see also Barker*, 407 U.S. at 530. We will examine each factor in turn.

*(a) Length of the delay*

Although *Barker* is framed as a four-factor framework, the first factor, the length of the delay, "serves as a threshold consideration in determining whether further inquiry is required." *Lankford*, 172 Idaho at ___, 535 P.3d at 184. As the United States Supreme Court noted in *Barker*: "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U.S. at 530. Thus, we must first decide whether the length of delay here is presumptively prejudicial.

In *Lankford*, this Court observed that it had "previously determined that a seven-and-a-half-month interval between a mistrial declaration and a second trial was presumptively prejudicial. . . ." 172 Idaho at ___, 535 P.3d at 185 (first citing *State v. Talmage*, 104 Idaho 249,

12

252, 658 P.2d 920, 923 (1983) (concluding a seven-and-one-half-month period was presumptively prejudicial); and then citing *State v. Lindsay*, 96 Idaho 474, 476, 531 P.2d 236, 238 (1975) (concluding a fourteen month period was presumptively prejudicial); and then citing *State v. Campbell*, 104 Idaho 705, 708, 662 P.2d 1149, 1152 (Ct. App. 1983) (concluding a twelve-month period was presumptively prejudicial)). We went on to conclude that the delay of over two years before retrial in *Lankford* was presumptively prejudicial.

In making this determination, this Court in *Lankford* looked to the period between the issuance of the remittitur and the commencement of the new trial. *Lankford*, 172 Idaho at ___, 535 P.3d at 185. Applying the same analysis here, we note that the remittitur in *Ish I* was issued on May 5, 2020, and Ish's second trial commenced on July 27, 2021. Thus, the length of delay was 448 days—almost 15 months. Consistent with this Court's prior decisions, we conclude that the length of the delay in this case was presumptively prejudicial and triggers further inquiry into the remaining three factors under *Barker*.

*(b) The reasons for the delay*

Having found the length of the delay presumptively prejudicial, we now turn to the reasons for the delay. Importantly, the weight ascribed to the various reasons for a delay is not necessarily the same. As the Supreme Court explained in *Barker*:

> [D]ifferent weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531 (footnote omitted). Ish correctly observes that none of the delays to his trial were caused by his own actions. Instead, he points to the multiple delays that were caused by this Court's COVID-19 emergency orders, the State's requests for continuances, and the district court's continuance on its own initiative.

First, concerning the COVID-19 delays, Ish recognizes that this Court's orders "suspending jury trials provided references to the good cause requirement set forth in I.C. § 19-3501." However, Ish asserts that the Idaho Supreme Court's orders did not toll or suspend Ish's federal or state constitutional rights to a speedy trial. In support of his position, Ish generally cites Justice Gorsuch's concurring opinion in *Roman Catholic Diocese of Brooklyn v. Cuomo*, where the Justice

13

explained that the "Government is not free to disregard the First Amendment in times of crisis." 592 U.S. 14, 21, 141 S. Ct. 63, 69, 208 L. Ed. 2d 206 (2020) (Gorsuch, J., concurring). Ish then points to the majority opinion, which explains that: "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19.

We acknowledge the authority cited by Ish and agree that the Constitution is always our lodestar and should not be forgotten—especially in times of crisis. However, even Justice Gorsuch recognized the right at issue in *Roman Catholic Diocese of Brooklyn* (attending religious services) was not absolute, such as when the government is "pursuing a compelling interest and using the least restrictive means available." *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 21 (Gorsuch, J., concurring) (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)). Further, as Justice White's concurring opinion in *Barker* explains, there can be intrusions into the right of a speedy trial upon a pressing public need: "A defendant desiring a speedy trial, therefore, should have it within some reasonable time; and only special circumstances presenting *a more pressing public need* with respect to the case itself should suffice to justify delay." *Barker*, 407 U.S. at 537 (White, J., concurring) (emphasis added).

In this case, as it pertains to the delays attributable to this Court's emergency orders, there were dire circumstances presenting "a more pressing public need": protecting the health of all trial participants during a global pandemic. While delays in commencing a trial must still be balanced against the defendant's interests under the *Barker* analysis, we conclude that the pandemic-related delays were justified under the circumstances. When the remittitur in Ish's case was issued, all jury trials were temporarily suspended statewide. This occurred during the early days of the COVID-19 pandemic when the virus was little understood and concepts like "social distancing" and "flattening the curve" were relatively new concepts. Of the 448 days between remittitur and Ish's second trial, this Court's pandemic-related orders accounted for 248 of those days. We conclude that these delays were justifiable under *Barker*. The following table illustrates the causes for the delays and the amount of time elapsed.

14

| Date of Event | Event | Elapsed Time |
|---|---|---|
| May 5, 2020 | *Issuance of Remittitur* | |
| Effective May 5, 2020 | Jury trials suspended statewide for the first time by Idaho Supreme Court's emergency order (suspended prior to issuance of the Remittitur on Mar. 23, 2020) | 132 Days* |
| Sept. 14, 2020 | Statewide suspension lifted by this Court; Bannock County extends suspension for its courts for 4 additional days | 4 Days* |
| Sep. 18, 2020 | *Jury trials resume in Bannock County; Ish's trial set for Dec. 7, 2020* | |
| Sep. 18, 2020 to Nov. 9, 2020 | Time between the first and the second suspension of jury trials by Idaho Supreme Court's emergency order | 52 Days** |
| Nov. 9, 2020 | Jury trials suspended statewide for the second time by Idaho Supreme Court's emergency order | 112 Days* |
| Mar. 1, 2021 | *Jury trials resume statewide; Ish's trial reset for Apr. 6, 2021* | |
| Apr. 6, 2021 | First continuance – Ish's trial reset for June 2, 2021 | 148 Days** |
| May 21, 2021 | Second continuance – Ish's trial reset for July 27, 2021 | |
| July 27, 2021 | *Ish's second jury trial commences* | |
| *Days elapsed during Supreme Court ordered suspension of jury trials | | 248 Days |
| **Days elapsed due to other reasons | | 200 days |
| ***TOTAL DAYS BETWEEN REMITTITUR AND START OF TRIAL*** | | ***448 Days*** |

As shown above, the remaining 200 days were attributable to, at least in part, decisions of the district court. Of those 200 days, there was a 52-day period between the first and second jury trial suspension.[2] During this period, the district court rescheduled the trial for December 7, 2020. The district court proceeded with preparations for trial—even holding a pretrial hearing just prior to the scheduled trial date. However, as the trial date approached, Idaho experienced a surge in COVID cases and this Court issued a second emergency order temporarily suspending jury trials. The district court was left with no choice but to continue the trial in light of this Court's order suspending jury trials statewide. Again, we conclude that this 52-day delay was justifiable and not attributable to anything within the district court's control.

---

[2] Ish argues that this was actually a 56-day period. While Ish is correct as to the number of days, the administrative district judge responsible for Bannock County, following the procedure prescribed by this Court, concluded that resumption of jury trials in Bannock County needed to be delayed four additional days. Ish does not challenge this conclusion or its effect on appeal.

Importantly, there is no claim that the prosecution intentionally delayed the trial during the first ten months following remand for a tactical advantage. These delays were all predicated on this Court's emergency orders and the dire public health emergency presented by the pandemic. *See State v. Ingraham*, 172 Idaho 30, ___, 528 P.3d 966, 973 (2023) ("The Emergency Order and its counterparts were issued by this Court to ensure that those safeguards of a free society continued in the face of a public health crisis, while at the same time balancing the need to protect the lives and health of those attending court proceedings.").

Once the second suspension was lifted on March 1, 2021, the trial commenced within 148 days—just under five months. While it is possible that the trial could have started sooner, there were neutral, yet legitimate reasons for the delays that occurred during this time frame, including the State's motion to continue due to two witnesses' unavailability, the court's difficulties in sending out the jury questionnaires, and an insufficient number of prospective jurors empaneled. We conclude that the reasons for the delays in this case, once the COVID-19 restrictions were mostly lifted, are either neutral or justifiable delays.

We are mindful that the presiding judge's June vacation was cited by Ish as an improper basis for the last continuance. However, the record establishes that the trial judge explained that "if we had been prepared to go, I would have probably had to forgo vacation plans." The court noted that difficulties with courthouse operations and witness availability had necessitated further delay. While *Barker* would treat these as neutral factors, under the circumstances they were justified. Reviewing the record as a whole, all proffered reasons were either neutral or a valid reason for delay. Therefore, we conclude that the second prong of *Barker* weighs in favor of the State.

*(c) Whether the defendant asserted the right to a speedy trial*

Regarding the third prong of *Barker*, whether the defendant asserted the right to a speedy trial, we defer to the factual findings of the district court. The district court found that Ish had asserted his right to a speedy trial:

> I will note for the record that Mr. Andrew has insisted upon Mr. Ish's right to speedy trial from the very beginning at almost every, if not every, juncture when we were talking about trial dates. So it's not an issue of not asking for the speedy trial. I think that's been sought consistently since the beginning.

16

Since our review of the record confirms that the district court properly found that Ish had consistently asserted his right at every opportunity, we conclude that the defendant properly asserted his right to a speedy trial. Therefore, the third prong of *Barker* weighs in Ish's favor.

*(d) The prejudice to the defendant*

Finally, under the fourth factor of the *Barker* balancing test, this Court looks to the prejudice to the defendant, if any, caused by the delay. As the Supreme Court explained in *Barker* there are three "interests" used to evaluate the prejudice factor:

> This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker*, 407 U.S. at 532 (internal footnote omitted).

We note that Ish's claims of prejudice are predicated on oppressive pretrial incarceration and the "anxiety and concern" caused by his continued incarceration pending trial. Ish does not directly allege that the Bannock County facilities were constitutionally inadequate; instead, he merely asserts that being held in the county jail was oppressive. For example, Ish claims that he "was never released from custody—causing him anxiety and concern—and he was denied the opportunity for medical treatment he desperately needed." Ish explains that he was required to pay for medications while in the county jail that he did not have to pay for while in the state prison. He also alleges that he contracted COVID while in the Bannock County jail and was denied a medical furlough.

We are unpersuaded that these concerns equate to legal prejudice. We hold that these occurrences, although unpleasant for Ish, were common to most of the incarcerated population at the time and do not constitute the excessive "anxiety and concern" *Barker* contemplates. Importantly, there is no evidence that they prejudiced his case on remand. Having successfully appealed his first conviction, Ish had to be returned to the county where he was charged because, having had his conviction vacated and his presumption of innocence restored, he could no longer remain in the custody of the Idaho Department of Corrections. He had an opportunity for bail, but could not post a bond.

17

Ish also alleges that his defense was impaired because a key witness for the State in the first trial could not be located to testify in the second trial. As Ish explains in his brief, "because Ms. [Lovette] Denny could not be located, she was declared an unavailable witness, and her trial testimony [from the first trial] was read into the record at the second trial." In his view, this prejudiced his defense because he could not cross-examine her regarding an affidavit she signed. As Ish further explains, "Ms. Denny signed a notarized affidavit . . . in which she stated that she had been pressured by the Pocatello Police and Bannock County Prosecutor's Office into untruthfully testifying at trial that Mr. Ish told her he had hurt or injured Mr. Red Elk." While we do not foreclose the possibility that a missing witness could impair a defendant's case, Ish has not demonstrated that the delay in bringing his case to a second trial on remand was the reason this witness was unavailable. Therefore, we cannot conclude that Ish's defense was impaired by the delay.

Taken together, we conclude that the fourth *Barker* factor weighs in favor of the State and the defendant has not shown that he was prejudiced due to the delay.

*(e) Conclusion*

Considering all four *Barker* factors, we conclude Ish's speedy trial rights have not been violated. Although the length of the delay was presumptively prejudicial and Ish timely asserted his right to a speedy trial, the remaining factors weigh in the State's favor. The most significant period of delay was related to the temporary suspension of jury trials by this Court due to the pandemic. The other delays due to the unavailability of certain State's witnesses were also justifiable. While the district court did sua sponte delay the trial for an additional month without explaining it at the time,[3] it later offered an extensive justification on the record, which included the neutral reason of the inability of the court to call a jury in time. We also note that when later faced with another request for a continuance from the State in July, again due to the unavailability of a witness, the district court denied the State's request based on Ish's assertion of his speedy trial rights. Once the issues related to this Court's COVID-19 emergency orders were resolved, Ish's case went to trial in less than six months.

---

[3] Ish only challenges his delays as a violation of his speedy trial rights and does not argue that this continuance was an abuse of discretion. Accordingly, we do not address whether it was an independent error to continue the trial in the manner the district court did here.

In conclusion, we are mindful that *Barker* is a "balancing test" and that every factor does not carry an equivalent weight. After carefully weighing and balancing all the relevant factors, we conclude that there has been no violation of Ish's speedy trial rights.

**B.  The district court did not err in denying the motion to change venue.**

Ish next maintains that the district court committed reversible error by denying his motion for a change of venue. As we have said, "[t]he Court employs an abuse of discretion standard when reviewing a district court's ruling on a motion to change the venue." *State v. Sheahan*, 139 Idaho 267, 278, 77 P.3d 956, 967 (2003) (quoting *State v. Jones*, 125 Idaho 477, 484, 873 P.2d 122, 129 (1994)). In addressing a motion to change venue "the Court determines whether, in the totality of existing circumstances, juror exposure to pretrial publicity resulted in a trial that was not fundamentally fair." *Id.* (citing *State v. Winn*, 121 Idaho 850, 856, 828 P.2d 879, 885 (1992)). We review a district court's decision regarding a motion for a change of venue by considering these five factors:

> [1] the existence of affidavits indicating prejudice or an absence of prejudice in the community where the trial took place; [2] the testimony of the jurors at jury selection regarding whether they had formed an opinion based upon adverse pretrial publicity; [3] whether the defendant challenged for cause any of the jurors finally selected; [4] the nature and content of the pretrial publicity; and [5] the amount of time elapsed between the pretrial publicity and the trial.

*Id.* (citing *Winn,* 121 Idaho at 856, 828 P.2d at 885).

In his brief, Ish asserts that 44 of the 92 prospective jurors had been exposed to some amount of media coverage about the case. However, the proper inquiry is not merely whether prospective jurors were aware of the case due to media coverage. *See State v. Hadden*, 152 Idaho 371, 376, 271 P.3d 1227, 1232 (Ct. App. 2012) ("Publicity by itself does not require a change of venue . . . ." (citation omitted)). Rather, the issue is whether the jurors were somehow tainted by their exposure to coverage. *State v. Hall*, 111 Idaho 827, 830, 727 P.2d 1255, 1258 (Ct. App. 1986) ("When a trial judge finds a reasonable likelihood that qualitative or quantitative elements of pretrial publicity have affected the impartiality of prospective jurors, the constitutional balance swings in favor of assuring a fair trial."). It has never been the standard that a prospective juror must have had no exposure to the media. Indeed, citizens who read a daily newspaper, watch a nightly news broadcast, and generally stay abreast of current events have not somehow disqualified themselves from future jury service. The critical inquiry is whether the nature of their exposure to pretrial publicity caused the prospective juror to form an opinion about the defendant's guilt and,

19

as a result, they are unable to serve as an unbiased juror. *Hadden*, 152 Idaho at 377, 271 P.3d at 1233 ("When reviewing the nature and content of the pretrial publicity, this Court is concerned with the accuracy of the pretrial publicity, the extent to which the articles are inflammatory, inaccurate, or beyond the scope of admissible evidence, the number of articles*, and whether the jurors were so incessantly exposed to such articles that they had subtly become conditioned to accept a particular version of the facts at trial*." (emphasis added) (citing *Sheahan*, 139 Idaho at 278, 77 P.3d at 967; and *Hall*, 111 Idaho at 829–30, 727 P.2d at 1257–58)).

Fatal to Ish's claim is the lack of evidence in the record indicating the "nature and content of the pretrial publicity" in this case. There is no evidence detailing the amount of coverage and its tone. Without such evidence, we cannot determine whether the jury pool was tainted by media coverage that was pervasive, sensationalized, inaccurate, or misleading. *See Hadden*, 152 Idaho at 376, 271 P.3d at 1232 ("Publicity by itself does not require a change of venue . . . ." (citation omitted)). Moreover, there is no evidence regarding the timing of the coverage. For example, was the bulk of the coverage concerning the remand after *Ish I* was decided, or was it heavier in the days preceding trial? Without knowing the time period between the pretrial publicity and the start of the trial, we cannot conclude that the district court abused its discretion. In essence, Ish would have us find error simply because roughly half of the jurors reported that they were aware of the case through the media in some manner. This is not the appropriate standard under *Sheahan* or *Winn*. *See Sheahan*, 139 Idaho at 278, 77 P.3d at 967; *Winn*, 121 Idaho at 856, 828 P.2d at 885.

Ish also focuses on the fact that the trial judge in his first trial granted a similar motion to change venue, and that the State eventually joined in his motion to change venue for the second trial. Neither of these points are determinative of this issue. First, there has been no effort made to compare the level of media coverage of the first trial with the second trial. Even if venue was changed in the first trial, that does not automatically mean that it would be harder to select an unbiased jury four years later, much less satisfy the legal prerequisites for changing venue under *Winn*. Similarly, the mere fact that the motion was joined by the State does not automatically mean that the denial of the motion by the district court was an abuse of its discretion. The court is not bound by a stipulation of counsel—it must still apply the law.

Such discretionary decisions involve highly fact specific inquiries; yet the facts supporting the need for a change of venue are largely missing from this appeal. This is not an unreasonably high hurdle for a defendant to clear, but it does require proof of prejudice or a showing of a

20

"reasonable likelihood" of prejudice. *See Hadden*, 152 Idaho at 376, 271 P.3d at 1232 ("[A] defendant's inability to make a detailed and conclusive showing of prejudice is not a proper ground for refusing to change venue as prejudice seldom can be established or disproved with certainty . . . . Rather, it is *sufficient for the accused to show there was a reasonable likelihood prejudicial news coverage prevented a fair trial* in violation of the Sixth Amendment to the United States Constitution." (citations omitted) (emphasis added)); *Hall*, 111 Idaho at 829, 727 P.2d at 1257 ("Impartiality may be affected adversely by the *quality or the quantity of pretrial media coverage*. Qualitatively, the courts must be concerned with news stories and editorials that are inflammatory, inaccurate or beyond the scope of admissible evidence." (citing *State v. Beason*, 95 Idaho 267, 506 P.2d 1340 (1973) (emphasis added))).

In the absence of such evidence, we must base our decision on the findings made by the district court, as supported by the record. Here, the only evidence offered and considered by the court consisted of the information provided by potential jurors in their jury questionnaires and during voir dire. The record shows many jurors had a general awareness of the existence of the case, while many also indicated that they had not "heard/seen/read anything about this case." Importantly, Ish has pointed to no particular jurors, aside from Juror No. 3,[4] who he believed had experienced prejudicial pretrial exposure to the case through the media *and* who ultimately served on the trial jury. In the absence of such evidence, the district court recognized that "the nature and extent of any pretrial publicity about [the] case [was] only generally addressed in Ish's motion and argument." Accordingly, the district court found that "[t]here is *no evidence* before this [c]ourt concerning distant past or current media attention to this case." (Emphasis added).

Having reviewed the record, we conclude that this finding of the district court is supported by the record. Thus, Ish has not carried his burden in demonstrating that the district court abused its discretion by denying the motion to change venue. Based on "the totality of existing circumstances" found in the record, we cannot say that "juror exposure to pretrial publicity resulted in a trial that was not fundamentally fair." Accordingly, we must affirm.

## C. Ish has not demonstrated that Juror No. 3 should have been excused for bias.

At the commencement of the trial, during voir dire, Juror No. 3 disclosed that he was a probation officer for the State of Idaho and that he had often worked with the Pocatello Police

---

[4] *See* section III(C), *infra.*

Department. Ish's challenge to Juror No. 3 for cause was denied by the district court. Later, during the State's case-in-chief, it was discovered that a State's witness, Narci Kimball, had not been on the State's list of witnesses reviewed with the jury during the initial voir dire. When the court allowed the attorneys to further voir dire the trial jurors regarding Kimball, Juror No. 3 indicated that he knew her. He informed the court that "a couple, three years, I think four years since" he was a probation officer for Kimball's husband. When asked about the effect this remote connection would have on his ability to weigh the evidence, Juror No. 3 explained that it would not impact his ability to be a juror. Ish argues that the district court erred when it denied both his requests to remove Juror No. 3 for cause, arguing that Juror No. 3 was both actually and impliedly biased. The State responds by asserting that Ish has not demonstrated actual bias and that implied bias is statutorily limited. We will begin with Ish's claim of implied bias.

As we have consistently held, "the due process requirements of the Idaho Constitution require 'a trial by a fair and impartial jury.' " *State v. Lankford*, 162 Idaho 477, 485, 399 P.3d 804, 812 (2017) [hereinafter "*Lankford 2017*"] (quoting *State v. Nadlman*, 63 Idaho 153, 163, 118 P.2d 58, 62 (1941)). We also recognized that "the right to a fair trial before an impartial jury is fundamental to both the U.S. Constitution and the Idaho Constitution." *Lankford 2017*, 162 Idaho at 485, 399 P.3d at 812 (first citing U.S. Const. amends. VI, XIV; and citing Idaho const. art. 1, sections 7, 13; and then citing *State v. Abdullah*, 158 Idaho 386, 421, 348 P.3d 1, 36 (2015)). To ensure a fair trial, "[t]he impartiality of a juror may be challenged for 'actual or implied' bias." *Id.* (first citing *United States v. Wood*, 299 U.S. 123, 133, (1936); and then citing *Abdullah*, 158 Idaho at 421, 348 P.3d at 36). As explained in *Wood*, both forms of bias can disqualify a prospective juror:"[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law." *Wood*, 299 U.S. at 133.

In addition to these constitutional protections, Idaho Code provides defendants with a statutory right to challenge jurors for cause on the grounds of actual or implied bias. Idaho Code section 19-2019 articulates the distinction between both types of bias:

PARTICULAR CAUSES OF CHALLENGE. Particular causes of challenge are of two kinds:

    1.  For such a bias as, when the existence of the fact is ascertained, in judgment of law disqualifies the juror, and which is known in this code as implied bias.

2.  For the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which, in the exercise of a sound discretion on the part of the trier, leads to the inference that he will not act with entire impartiality, and which is known in this code as actual bias.

I.C. § 19-2019.

Counsel's questioning of Juror No. 3 revealed no evidence of actual bias on his part. While we understand Ish's argument that we should recognize implicit bias due to Juror No. 3's occupation and his association with the husband of a witness, we decline to add to the statutory list of relationships in Idaho Code section 19-2020 that automatically create an inference of implicit bias. In *United States v. Wood*, the Supreme Court recognized that "the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula," 299 U.S. 123, 146 (1936), the extent of this right is generally left to the states. Having considered the question, we cannot say that district court abused its discretion by declining to conclude that the relationships alleged here are sufficiently analogous to the existing statutory relationships to find automatic grounds to automatically remove a probation officer for cause. Therefore, we must analyze this issue based on the record before us.

*(1)  Ish has not demonstrated implied bias.*

Ish appears to argue for this Court to expand the categories upon which a juror may be challenged for implied bias. In support of his argument, Ish relies on *Fields v. Brown*, 503 F.3d 755 (9th Cir. 2007) (en banc). In *Fields*, the Ninth Circuit sitting en banc considered three different challenges of bias. 503 F.3d at 766 ("[The defendant's] claim of juror bias puts three theories on the table: so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire; actual bias. . . , and implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury.").[5] The Ninth Circuit applied its own precedents and found there was no bias, under any of the three theories advanced, after recognizing "the Supreme Court has not explicitly adopted (or rejected) the doctrine of implied bias." *Fields*, 503 F.3d at 768.

Relying on *Fields*, Ish argues that a business relationship between a prosecutor's office and a juror is an automatic basis for finding implied bias and should be characterized as an

---

[5] *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) (plurality opinion).

"inappropriate extrinsic influence." However, without disclosing it as such to this Court, the language Ish relies on comes from the dissenting opinion in *Fields*. Indeed, Ish seems to overlook the majority's conclusion in *Fields*, which recognized the "distinct concepts" of implied bias at play. In responding to the dissenting opinion in *Fields*, the majority opinion recognized the same distinct concepts which Ish also seems to conflate:

> [The dissent's] conclusion to the contrary collapses the distinct concepts of implied bias-which arises intrinsically from an "extreme" and "extraordinary" relationship between a juror and an aspect of the litigation-and ex parte communication with, or extrinsic influence on, a juror. *To do so creates a novel, hybrid category of implied bias that goes well beyond anything heretofore recognized.*

*Fields v. Brown*, 503 F.3d 755, 775 n.14 (9th Cir. 2007) (emphasis added) (internal opinion citations omitted). Thus, the specific theory advanced by Ish was rejected by the majority because it relies on a separate constitutional issue outside the holding of *Wood*. Accordingly, we likewise decline to apply the dissent's analysis in *Fields* in the manner advanced by Ish, as to do so would create "a novel, hybrid category of implied bias that goes well beyond anything heretofore recognized." *Fields*, 503 F.3d at 775 n.14.

As explained in our precedents: "Implied bias . . . conclusively presumes bias as a matter of law based on the existence of a specific fact." *Lankford 2017*, 162 Idaho at 485, 399 P.3d at 812 (first citing I.C. § 19-2018(1); and then citing *Wood*, 299 U.S. at 133). Idaho Code section 19-2020 contains an exhaustive list of statutory challenges for implied bias. I.C. § 19-2020 ("A challenge for implied bias may be taken for all or any of the following causes *and for no other*. . . ." (emphasis added)). Ish has not demonstrated or otherwise argued that any of the legislatively designated relationships constituting grounds for implied bias in Idaho Code section 19-2020 are applicable to this case, nor can we find that the relationship at issue here is sufficiently analogous to the type of relationships which qualify for removal on the grounds of implied bias. In the absence of such, we are left to conclude that Ish has not demonstrated implied bias.

*(2) Ish has not demonstrated actual bias.*

Unlike implied bias, this Court has explained that "[a]ctual bias deals with the specific state of mind of an individual juror and is proved by questioning the juror as to whether he or she can serve with entire impartiality." *Lankford 2017*, 162 Idaho at 485, 399 P.3d at 812 (first citing I.C. § 19-2018(2); and then citing *Abdullah*, 158 Idaho at 421–22, 348 P.3d at 36–37); I.C. § 19-2019(2) ("For the existence of a state of mind on the part of the juror in reference to the case, or

24

to either of the parties, which, in the exercise of a sound discretion on the part of the trier, leads to the inference that he will not act with entire impartiality, and which is known in this code as actual bias."). To succeed on a claim of actual bias, Ish must establish evidence that "in the exercise of a sound discretion on the part of the trier, leads to the inference that [the juror] will not act with entire impartiality . . . ." I.C. § 19-2019(2).

Ish offers Juror No. 3's questionnaire and his statements made during voir dire as grounds for finding actual bias. Yet neither the questionnaire responses nor the statements Juror No. 3 made during voir dire demonstrate any actual bias on his part.

We acknowledge that the most concerning disclosure by Juror No. 3 occurred during the trial, when he disclosed that as a probation officer, he had previously supervised the husband of one of the State's witnesses. As discussed more fully above, during the State's case-in-chief, it was discovered that the State's witness Narci Kimball had been inadvertently left off the jury questionnaire sent to prospective jurors prior to trial. When she was called to testify, Juror No. 3 timely disclosed to the district court his connection to Kimball, through her husband. The timing of this disclosure was not Juror No. 3's fault and his integrity in timely bringing this to the court's attention is commendable. While this disclosure was understandably concerning, Ish was provided an opportunity to inquire into the connection and demonstrate actual bias—yet he was unable to do so.

Reviewing the record, we cannot find an abuse of discretion by the district court. As to defense counsel's extended colloquy with Juror No. 3, Ish has failed to demonstrate that Juror No. 3 could not serve "with entire impartiality." *Lankford 2017*, 162 Idaho at 485, 399 P.3d at 812 (citations omitted). In fact, there is no indication that Juror No. 3 would find *any* of the evidence more or less credible—especially Kimball's testimony, which was merely foundational in nature. Although Kimball testified that she discovered Red Elk lying injured in the parking lot, she did not implicate Ish or anyone else.

Taken together, Ish has not demonstrated bias, either actual or implied. Thus, we cannot conclude that the trial court abused its discretion in allowing Juror No. 3 to remain on the jury.

**D. Because we have found no individual errors in the proceedings, there can be no cumulative error.**

Ish asserts that even if any combination of the individual errors alleged above are found to be harmless, they still amount to reversible error when considered in the aggregate. Of course,

having found no error, it has not been necessary for this Court to make any conclusions about harmless error in this opinion. As we have said: "In order to find cumulative error, this Court must first conclude that there is merit to more than one of the alleged errors and then conclude that these errors when aggregated, denied the defendant a fair trial." *State v. Capone*, 164 Idaho 118, 127, 426 P.3d 469, 478 (2018) (quoting *Dunlap v. State*, 141 Idaho 50, 65–66, 106 P.3d 376, 391–92 (2004)). Importantly, "a necessary predicate to the application of the [cumulative error] doctrine is a finding of more than one error." *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2010) (citing *State v. Hawkins*, 131 Idaho 396, 407, 958 P.2d 22, 33 (Ct. App. 1998)). Therefore, because we have found no error below, we cannot conclude that cumulative error has been shown.

**E. The *Pearce* presumption of vindictiveness, as it pertains to the sentencing by the same judge, does not apply here.**

At Ish's original sentencing, he received 15 years with 10 years fixed and 5 years indeterminate. However, following his second trial, he was sentenced to 14 years fixed with 1 year indeterminate for the same crime. As Ish explains in his brief, "the district court increased the fixed portion of his sentence by four years, without explanation." Thus, Ish argues that under *North Carolina v. Pearce*, 395 U.S. 711 (1969), he is entitled to a legal presumption that his second, harsher sentence following his successful appeal was vindicative. Relying on his argument that the presumption applied, Ish argues that the district court erred by failing to articulate what conduct in the period between his first and second sentencing justified the increase in his sentence.

In *Pearce*, the United States Supreme Court recognized "that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction." *Id.* at 723. In that regard, the Supreme Court made clear that: "[a] trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' " *Id.* However, the Supreme Court qualified its holding: "To say that there exists no absolute constitutional bar to the imposition of a more severe sentence upon retrial is not, however, to end the inquiry. There remains for consideration the impact of the Due Process Clause of the Fourteenth Amendment." *Id.* Thus, the Supreme Court further held that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." *Id.*

Subsequent cases have limited the application of what has since been called the "*Pearce* presumption*,*" which presume vindictiveness when the same sentencing judge provides an enhanced sentence for the same charge without making the reasons justifying the sentence affirmatively clear. For example, in *Alabama v. Smith*, 490 U.S. 794 (1989), the United States Supreme Court overruled the application of *Pearce* when the sentence following the first conviction was entered upon a guilty plea and the second sentence was entered after trial following a successful appeal. As the Court clarified: "While the *Pearce* opinion appeared on its face to announce a rule of sweeping dimension, our subsequent cases have made clear that its presumption of vindictiveness 'do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial.' " *Alabama v. Smith*, 490 U.S. at 799 (quoting *Texas v. McCullough*, 475 U.S. 134, 138 (1986)). In *Texas v. McCullough*, 475 U.S. 134 (1986), the Supreme Court held that "[t]he presumption of *Pearce* does not apply in situations where the possibility of vindictiveness is this speculative, particularly since the presumption may often 'operate in the absence of any proof of an improper motive and thus . . . block a legitimate response to criminal conduct. . . .' " *McCullough*, 475 U.S. at 139 (citing *United States v. Goodwin*, 457 U.S. 368, 373 (1982)).

This Court has applied *Pearce* and its progeny as a brightline rule, holding that "[a] presumption of vindictiveness in sentencing only applies where the defendant has successfully appealed a conviction and received a greater sentence *by the same district court* after a retrial or remand." *State v. Herrera*, 164 Idaho 261, 279, 429 P.3d 149, 167 (2018) (emphasis is original) (quoting *State v. Baker*, 153 Idaho 692, 695, 290 P.3d 1284, 1287 (2012)). Thus, "[a]bsent the presumption, the defendant must show actual vindictiveness." *Id.* (citing *State v. Robbins*, 123 Idaho 527, 527, 850 P.2d 176, 181 (1993)).

In light of these cases, counsel for Ish clarified his position at oral argument, conceding that the *Pearce* presumption does not apply when a different sentencing judge handles the subsequent sentencing. Ish's argument rests solely on the premise that since Judge Carnaroli heard the Rule 35 motion in the first trial, Judge Carnaroli should be deemed the same sentencer in the second trial. Thus, he argues that the presumption of vindictiveness should apply. Although this is a situation not addressed by the case law, we disagree with Ish and hold that a judge who ruled on a post-sentencing motion following the first trial, such as Rule 35 motion, and then later sentences a defendant after a subsequent trial, remains a different sentencer for purposes of *Pearce* and *McCullough*.

Idaho Criminal Rule 35 provides that "a motion may be filed *to correct* a sentence that has been imposed in an illegal manner *or to reduce a sentence* and the court *may correct or reduce* the sentence." (Emphasis added). Rule 35 does not allow or contemplate *resentencing;* rather, it merely provides an opportunity to correct or reduce the original sentence. We are not persuaded that by ruling on a post-sentencing motion from the first trial, this somehow placed the second sentencing judge into the shoes of the original sentencer. Since "[t]he presumption is also inapplicable [when] different sentencers assessed the varying sentences," we are left to conclude that the *Pearce* presumption is inapplicable here. *McCullough*, 475 U.S. at 140. Accordingly, we hold that under the unique circumstance of this case, a district judge who did not sentence a defendant in a prior trial, but later ruled on a Rule 35 motion and then presided over a subsequent trial and sentencing, is a different judge for the purposes of the *Pearce* presumption.

We note that our holding here is limited to our specific conclusion that a district judge who only ruled on a Rule 35 motion before remand, is not the same sentencer for the purposes of *Pearce* and *McCullough*. Because Ish has challenged his sentence only on this basis, we do not address whether, in the context of a subsequent conviction after successful appeal under *Pearce* and *McCullough*, a different sentencing judge is required to give any explanation at all for a sentence in excess of the original one.

## C. The district court did not abuse its discretion by imposing an unduly harsh sentence.

As this Court has said, "[s]o long as the sentence is within the statutory limits, the appellant must show that the trial court, when imposing the sentence, clearly abused its discretion." *State v. Knighton*, 143 Idaho 318, 319, 144 P.3d 23, 24 (2006). When reviewing a discretionary decision of a trial court, this Court employs its well-known abuse of discretion standard: "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Leavitt*, 171 Idaho at 525 P.3d at 1157 (alteration in original) (quoting *Villa-Guzman*, 166 Idaho at 384, 458 P.3d at 962); *see also Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

As it pertains to the alleged abuse of discretion in his sentence, Ish seems to concede the first three elements of *Lunneborg* and instead challenges the sentence handed down by the district court solely as a failure of an exercise of reason. Specifically, Ish argues that "[i]n light of the mitigating factors present in this case, Mr. Ish's sentence is excessive considering any view of the

facts." Ish points to a heart condition and the support of his family. Ish explained at sentencing that he developed a heart condition after having COVID-19. Additionally, he explained that his "family members want him home, and they are willing to help him with housing."

While Ish argues that the district court did not "properly consider[] Mr. Ish's family support and his physical health conditions," the record demonstrates that the district court considered these factors. The district court noted that he reviewed the presentence investigation report (the "PSI"), which includes information about Ish's family support and health conditions, and both were addressed by Ish in his argument at sentencing. While the district court did not recite every fact contained in the PSI in handing down its sentence, this does not mean it was not considered. More importantly, this does not amount to a failure of an exercise of reason.

A review of the district court's overall analysis when sentencing Ish shows a detailed, reasoned analysis of the relevant law, principles, and facts of this case. The district court properly considered sentencing factors set forth in Idaho Code section 19-2521 and the four objectives of criminal punishment we have long articulated. *See State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982) ("[The Idaho] Supreme Court has articulated four objectives of criminal punishment: (1) protection of society, (2) deterrence of the individual and the public generally, (3) possibility of rehabilitation, and (4) punishment or retribution for wrongdoing."). These were all addressed by the district court. While Ish's health and his family's support for him may be mitigating factors, Ish has not demonstrated how the information he claims that the district court failed to consider would have changed the court's analysis of the statutory factors or the *Toohill* objectives at sentencing.

Ish concedes that the district court's sentence was within the boundaries of its discretion and the legal choices available to it under the applicable statute. Indeed, the maximum punishment for voluntary manslaughter is "a fine of not more than fifteen thousand dollars ($15,000), or by a sentence to the custody of the state board of correction not exceeding fifteen (15) years, or by both such fine and imprisonment." I.C. § 18-4007. Here, the district court applied the sentencing criteria under Idaho Code section 19-2521 and sentenced Ish accordingly. Thus, we conclude that the district court properly exercised its discretion in the sentencing of Ish.

**D. The district court did not err in denying Ish's Rule 35 motion for leniency following his second sentence.**

Following Ish's sentencing after his second trial, Ish filed a motion for relief from his sentence pursuant to Rule 35. Ish challenges the district court's denial of his Rule 35 motion for leniency. Although not clear, it does not appear that Ish is claiming that he was entitled to relief under Rule 35(a), which pertains to illegal sentences. Rather, Ish's claims appear to be based on Rule 35(b), which allows a court to "correct or reduce" an excessive sentence based on additional information.

As it pertains to Rule 35, we have explained the purpose and operation of the rule:

> Rule 35 is a narrow rule which allows a trial court to correct an illegal sentence or to correct a sentence imposed in an illegal manner. Generally, whether a sentence is illegal or whether it was imposed in an illegal manner is a question of law, over which we exercise free review. However, if the basis for the illegality of the sentence is that the sentence is excessive, and the sentence is within the statutory limits, a motion for reduction of sentence under Rule 35 is a plea for leniency, and this Court will then review a denial or grant of the motion for an abuse of discretion. When presenting a Rule 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the district court in support of the Rule 35 motion. An appeal from the denial of a Rule 35 motion cannot be used as a vehicle to review the underlying sentence absent the presentation of new information.

*State v. Draper*, 151 Idaho 576, 601, 261 P.3d 853, 878 (2011) (citing *Farwell*, 144 Idaho at 735, 170 P.3d at 400). "If the sentence was not excessive when pronounced, the defendant must later show that it is excessive in view of new or additional information presented with the motion for reduction." *State v. Knighton*, 143 Idaho 318, 320, 144 P.3d 23, 25 (2006).

Ish argues that the district court improperly "focused on an increasingly violent society and deterrent effect of a lengthy sentence for Mr. Ish." Ish maintains that he provided the court with additional evidence providing relevant statistical information indicating "that society in fact was not growing more violent—the district court was laboring under a misapprehension." Additionally, Ish also notes that the district court fixated on a "1982 Utah robbery conviction in concluding that Mr. Ish was violent, [but] the PSI did not contain the details of that offense."[6]

---

[6] Ish also submitted his completion of an anger management program in 2013 and other related programming in 2014 as justification for leniency. However, this programming was before the district court when it initially sentenced Ish upon his second conviction. The transcript reflects that there was other programming completed after Ish's second conviction, but completion of that programming is not in the record. We note that even though evidence of the programming's completion is not in the record, the district court inquired about the completion certification, which was not provided to the district court, and took the subsequent programming into consideration when it ruled on the motion for leniency.

In denying the Rule 35 motion, the district court issued a written decision that concluded Ish had not provided any new information: "The [court] finds that the Defendant failed to bring forth any new or different evidence or information that would support his motion for a correction or reduction. The Defendant further failed to show the [court] that the original sentence was unduly severe." The district court explained that while it considered the request for leniency, "the Defendant has offered no reason why the [court] should be more lenient other than the fact that the prior sentencing judge was more lenient and the fact that it appears he has been [a] compliant inmate."

The district court addressed the evidence Ish provided to undercut the court's statements made at sentencing regarding the culture of violence in our society. The district court explained:

> Defendant did take issue with a few of the comments made by the [c]ourt during the sentencing. These comments regarding violent crimes, societal indifference or de-sensitivity towards violence and the rise of professional mixed martial arts as violent and bloody form of entertainment were merely observations made by the [c]ourt. Whether or not society is more violent now than before he committed his crime is not the issue. We live in [a] violent society. It was violent in 2009, and it is violent now. The Defendant's crime is one of violence that took human life unnecessarily.

> Ultimately, the [c]ourt sentenced [the] Defendant based solely on his conduct and the testimony heard during his retrial. The Defendant violently attacked the victim Lorne Red Elk either with [a] devastating punch to the head with his fist, or with [a] blow to the head struck with blunt instrument causing Red Elk to die from [a] severe brain injury. The next morning, the Defendant bragged to his family members about attacking the victim and about leaving him bleeding and gurgling on the pavement outside Duffy's Tavern. He complained with [disdain] that Red Elk's blood was on his shoes. He later threatened a witness to stay quiet. If not for the bravery of the witnesses who came forward years later, the homicide that caused Red Elk's death would likely have never been solved.

Ish was convicted of brutally killing a man; thus, it was not surprising that the district court expressed general concerns about violence in society. We find no error in the court's comments.

As we have said: "If the sentence was not excessive when pronounced, the defendant must later show that it is excessive in view of new or additional information presented with the motion for reduction." *State v. Knighton*, 143 Idaho 318, 320, 144 P.3d 23, 25 (2006) (quoting *State v. Trent*, 125 Idaho 251, 253, 869 P.2d 568, 570 (Ct.App.1994)). Further, "[i]f the defendant fails to make such a showing, the denial of the motion is not an abuse of discretion." *Id.* (citing *State v. Shiloff*, 125 Idaho 104, 107, 867 P.2d 978, 981 (1994); and *State v. Hernandez*, 121 Idaho 114,

31

822 P.2d 1011 (Ct. App. 1991)). Ish has made no such showing here. We cannot say that under any view of the facts that the 14-year fixed term was excessive for taking a life in such a manner. Therefore, we affirm the denial of the Rule 35 motion for leniency because Ish has not shown that the sentence was excessive in light of any new information provided.

## IV. CONCLUSION

For the reasons explained above, the judgment of conviction and sentence are affirmed.

Chief Justice BEVAN, Justices BRODY, ZAHN and MEYER CONCUR.